OPINION
{¶ 1} Defendant-appellant, Roxane Laboratories, Inc., appeals from a judgment by the Franklin County Court of Common Pleas in favor of plaintiff-appellee, Kevin L. Waddell, in this action for wrongful termination of employment on the grounds of racial discrimination. The matter was tried before a jury which, by a unanimous verdict, awarded appellee $135,000 in compensatory damages, with an additional $250,000 in punitive damages, plus attorney fees.
 {¶ 2} Appellant Roxane is a pharmaceutical company operating a manufacturing facility in Columbus. In 1997, Roxane hired Waddell, an African-American male, to work as a buyer in its purchasing department. Waddell quickly established himself as a hard-working, professional employee, about whose work his supervisors had no complaints. That same year, Roxane hired Dyonne Weaver, a white female, to work in its human resources department. In early 1998, Weaver obtained a new position in the company as a purchasing coordinator, which resulted in her being a part of Waddell's work group and both reported to the same manager. Although Weaver was not his subordinate, Waddell was assigned the task of training her in the new position. Weaver complained to her supervisors regarding Waddell's behavior, which she considered to be sexual harassment, and, on at least two occasions, supervisors discussed the matter with Waddell, who denied that he had behaved inappropriately.
 {¶ 3} In early 2000, Weaver resigned her position, and told her supervisor and a human resources representative about her problems with Waddell, blaming Waddell's conduct, in part, for her decision to quit. The human resources department then contacted the company's attorney, Allyn M. Carnam, who, with paralegal Vesna Arthur, conducted interviews with Waddell, supervisor Nancy Horsefield, and other co-workers who either had witnessed interactions between Waddell and Weaver or who had their own stories of inappropriate behavior by Waddell. Weaver refused to be interviewed in this investigation. Based upon the information gathered in these interviews and upon Weaver's allegations at the time of her resignation, Carnam recommended the termination of Waddell's employment, and Waddell was fired on February 29, 2000.
 {¶ 4} Waddell initiated this action in May 2000, and Roxane followed with a motion for summary judgment, arguing that Waddell was unable to establish a prima facie case of racial discrimination and that Roxane had a legitimate business purpose for firing Waddell. The trial court found Roxane had a legitimate business purpose in firing Waddell, but denied summary judgment on the basis that Waddell had raised a genuine issue of fact as to whether white male employees were similarly situated and treated more favorably by Roxane. Construing the facts in favor of Waddell, the court determined that Waddell had set forth sufficient evidence from which reasonable minds could infer that Roxane's stated purpose for firing him was a pretext for racial discrimination. The matter then proceeded to trial.
 {¶ 5} At trial, Weaver testified that, although Waddell was initially cordial and professional toward her, shortly after she began in the new department Waddell called her into a conference room and asked her on a date, which she declined. Thinking this was the end of the matter, Weaver did not tell her supervisor, but learned later that Waddell was making negative comments about her behind her back. She reported Waddell's conduct to their manager, John Sinclair, who told her that Waddell was in the midst of a divorce, that she should not take it personally, and that he would talk to Waddell about it.
 {¶ 6} Weaver testified that further problems with Waddell's conduct occurred. She stated that Waddell would come up behind her in her cubicle and startle her, that he would watch her over the top of her cubicle, listen to her phone calls, look at her computer screen, talk to her within a few inches of her face, and make comments about her breasts and her sex life. She also said she would notice him watching her in the company cafeteria.
 {¶ 7} By this time, Sinclair was no longer their supervisor, and Weaver went to her new boss, Tim Howard, to complain about Waddell's behavior. She testified that Howard's response was that the group needed teamwork, that he suggested the problems with Waddell were her fault, and that she subsequently received a negative evaluation, citing her for lack of teamwork.
 {¶ 8} Weaver testified that, in the early summer of 1999, Waddell's behavior toward her improved, and she heard that he had gotten engaged. During the late summer of 1999, Nancy Horsefield became Waddell and Weaver's new manager. Weaver stated Waddell's unwanted behavior started again in October 1999, when Weaver revealed to co-workers that she was dating someone. She testified that Waddell had asked her personal, inappropriate questions about her relationship, and that she reported this to Horsefield. Although Weaver testified that Horsefield told her that she would have to be the more professional of the two and find a way to work with Waddell, Horsefield testified that she never told Weaver this, and maintained at trial that Weaver did not report to her any problems with Waddell prior to their final meeting during which Weaver resigned.
 {¶ 9} At about this time, Horsefield began having complaints about Weaver's work performance. In her testimony, Weaver did not deny that her performance was inadequate, but attributed it to Waddell's failure to properly train her, the company's failure to fully explain her job duties, and her preoccupation with her chronically ill child. When Horsefield confronted her with complaints about her work deficiencies, Weaver at first denied that she had neglected to timely place some critical purchasing orders, but then admitted the work had not been done and abruptly announced she would resign. Weaver told Horsefield that worries about her child and frustrations in dealing with what she called "the Kevin situation" made her resignation necessary. (Tr. Vol. VII, at 1210.) Weaver then left Horsefield's office and returned with a letter of resignation in which she did not specify that Waddell was a reason for her decision. Later, in her exit interview with human resources representative Ann Wilson, however, Weaver told the history of her interactions with Waddell and cited his behavior as a reason for her decision to leave the company. At trial, Weaver testified that, although she had initially refused to assist in Carnam's investigation of her harassment complaints, she eventually accepted a settlement offer from the company, was rehired, and agreed to participate in the trial.
 {¶ 10} In his testimony, Waddell denied asking Weaver on a date or saying he wanted a personal relationship with her. He testified that he had not deliberately startled her in her cubicle, but, rather, that people at work were always being startled by co-workers entering their cubicles because of the placement of the computer screens in relation to the cubicle entrances. He related an incident in which he had asked Weaver to delay a photocopier purchase so that he could research the procurement of photocopiers at a cheaper rate. According to Waddell, Weaver ignored his request and bought copiers behind his back, and Waddell opined that the incident caused a bad work relationship between himself and Weaver, and may have been a source of her complaints about him.
 {¶ 11} On cross-examination, Waddell was asked about the other allegations of sexual harassment lodged against him by Roxane at trial, and explained an incident in which a female member of the cleaning staff alleged that he had exposed himself to her in the men's restroom. Waddell stated the exposure was inadvertent because the staff member had walked in on him while he was using the urinal, and said that no disciplinary measures had been taken against him for this incident. With regard to an incident in which another co-worker, Doris Tanksley, had complained to management that Waddell had clutched his heart when looking at her and said "be still my heart," Waddell explained that he had intended it as a joke, and that when he learned she was offended had apologized, telling her that since his divorce he was "like a kid in a candy store" with regard to the women at work. (Tr. Vol. IV, at 565-566.) He testified that, at the time, he did not think his candy store comment was sexual harassment, but that he now recognized that it was. Apparently, Roxane did not discuss the Tanksley incident with Waddell at the time it occurred, and Waddell argues that the matter was only raised at trial to support Roxane's claim of a legitimate business purpose in terminating his employment.
 {¶ 12} A key piece of evidence at trial was a memorandum written by Nancy Horsefield to her supervisors, in which she documented what had occurred during her meeting with Weaver which had concluded in Weaver's resignation. The memo stated, in part:
Dyonne was out on PTO * * * due to having a sick child. * * *
While Dyonne was out, I received several phone calls from users requesting status of their IT orders * * *. Dyonne was instructed to place these orders with the appropriate suppliers, and some of the orders went back to 12/29/99. I was unable to locate any paperwork for these orders in Dyonne's cubicle, so I phoned her at home. She indicated that she had the file at home with her. I sent a courier to obtain the file so that I could determine order numbers, etc. since the orders could not be located * * *. After checking the contents of the file and speaking with several suppliers, it was discovered that the orders were never placed and were merely just placed in a folder.
I approached Dyonne regarding this matter at 11:45 a.m. on Monday, 1/31/00. I indicated that it was difficult for me to now depend on her to follow through with certain very basic position functions, and that I would now * * * take over her order placement duties to ensure high service levels to our internal customers. I also counseled her on her tardiness and inconsistent use of the time clock * * *.
Dyonne then indicated that she was unhappy in her position, and that she intended to resign due to the illness of her child. This was the first such indication I had received from Dyonne regarding any type of job dissatisfaction. I indicated that I would accept her resignation and asked her to prepare a written resignation letter. She then indicated that it was difficult to perform her job with all of the personal stresses in her life. She then commented that a co-worker, Kevin Waddell, "made a comment about her and Chris's sex life." [Chris is her fiancée.] I told Dyonne that if she provided me with specific written details regarding this alleged comment including date of occurrence, time, location, any witnesses, etc., I would communicate the matter to the appropriate management representatives. Approximately one hour later, Dyonne provided me with her resignation letter * * *. No further discussions have occurred between Dyonne and me regarding any of these matters. At this time, Dyonne's last day is scheduled for 2/11/00.
 {¶ 13} Horsefield submitted the memo to Delores Lopresti in human resources, and received back another memo, drafted by Allyn Carnam, Roxane's attorney, as if from Lopresti, which stated:
We are returning to you the attached, above-referenced memorandum which you prepared regarding Dyonne Weaver.
Please be advised that we will not place this memo in Dyonne's personnel file as you proposed, for the following two reasons:
1. This memorandum is inconsistent with the facts that we have uncovered during the course of investigating Dyonne's sexual harassment complaint, which she brought forward to the Human Resources ("HR") Department on February 11, 2000 during her exit interview; and
2. Your memorandum does not reflect a balanced and accurate interpretation or view of the underlying facts and circumstances surrounding Dyonne's performance toward the end of her tenure at Roxane Laboratories, Inc.
In light of the foregoing, we request that you review with HR any future, substantive written communications regarding your direct reports before any such communications are placed in an employee's personnel file.
(Emphasis sic.)
 {¶ 14} Horsefield testified that, upon receiving this memo, she became concerned that it looked like she had done something wrong. She complained to her supervisor, Ron Tobin, who spoke with Lopresti about the memo. Horsefield testified that Tobin then reported back to her that the purpose of the memo had been "[t]o sanitize the files in the event that Mr. Waddell filed a racial discrimination suit against the company." (Tr. Vol. V, at 852.)
 {¶ 15} On cross-examination, Roxane attempted to draw from Horsefield an acknowledgement that the company's problem with the memo was that Horsefield's opinion had been tainted by unrealistic expectations of Weaver's work performance. In addition, the defense unsuccessfully sought an admission by Horsefield that her statement in the memo, that Weaver should provide specific written details of her sexual harassment allegations, was not a requirement of the company's sexual harassment policy and that Horsefield's written complaints about Weaver, coming as they did after Weaver had already resigned, were inappropriate for Weaver's personnel file. Carnam testified that he felt Horsefield's comments were retaliatory against Weaver for alleging sexual harassment against Waddell, and that it was not necessary for Horsefield to prepare such a memo if Weaver was already resigning. Carnam further testified that Horsefield had not handled Weaver's complaints about Waddell properly when she first heard of them some time before. Carnam stated:
* * * [T]he concern was of a potential sexual harassment suit by Dyonne Weaver. The last thing you want to deal with is a claim of retaliation. Clearly, what Nancy is doing is, she's commenting on Dyonne Weaver's performance, but she does not address or describe why her performance may not have been at the appropriate level.
I mean, obviously, if someone is being sexually harassed, they're probably not performing well. So, to the extent that the memo does not address that, it would seem to be one-sided.
Q. Why not talk to Nancy Horsefield in your investigation?
A. Well, because if I talked to Nancy, first of all, talking with Nancy Horsefield was not likely to provide me with any new or additional information. I had her memos. I had spoken with Ann Wilson at length about her conversations with Nancy Horsefield.
If we talked to Nancy Horsefield, we would be documenting, in my view, evidence that might be construed to be retaliation, and it was really important that we undertake this investigation, complete it as promptly as we could, get to the facts as best we could and then make a judgment.
What we didn't want to have to do is to create — what we didn't want to do is create evidence or create a document that in court would be interpreted as retaliation. That's a real concern of mine. It always has been in these kind of cases. You have to be very careful when you deal with sexual harassment complaints that you don't have that issue arise.
(Tr. Vol. VIII, at 1517-1518.)
 {¶ 16} Although Carnam repeatedly expressed his concern that statements by Horsefield regarding Weaver might be construed as retaliatory, thus prompting his decisions to keep Horsefield's memo out of the files and to avoid interviewing Horsefield during his investigation, Carnam never identified exactly why Horsefield would retaliate against Weaver — whether it be for her allegations of sexual harassment or for Horsefield's dissatisfaction with Weaver's work performance.
 {¶ 17} After hearing 12 days of testimony, the jury found in favor of Waddell, awarding him $135,000 in damages, $250,000 in punitive damages, and attorney fees. The trial court denied Roxane's motions for new trial or for remittitur, and for judgment notwithstanding the verdict on the punitive damages award and on the merits. In denying these motions, the court held that Waddell had provided sufficient evidence to establish ill will on the part of Roxane, specifically citing Horsefield's testimony that Roxane's purpose in rejecting her memo was to sanitize the files in case Waddell filed a discrimination suit, and that Waddell had presented sufficient evidence of a prima facie case of racial discrimination to allow the jury verdict to stand
 {¶ 18} Appellant now assigns the following as error:
Assignment of Error No. 1
The Trial Court erred in failing to grant Defendant-Appellant's motion in limine and allowing highly prejudicial evidence of non-similarly situated incidents to be introduced at trial.
Assignment of Error No. 2
The jury's verdict is improperly based on passion and prejudice.
Assignment of Error No. 3
The Trial Court erred in failing to grant a directed verdict or judgment notwithstanding the verdict on Counts I and III of the Complaint.
Assignment of Error No. 4
The punitive damage award should be reversed since there is no clear and convincing evidence of actual malice.
Assignment of Error No. 5
The punitive damage award violates the Due Process Clause of the Fourteenth Amendment since the Trial Court improperly allowed evidence of dissimilar conduct before the jury.
Assignment of Error No. 6
The Trial Court erred in failing to grant summary judgment on Counts I and III of the Complaint.
Assignment of Error No. 7
The award of attorney fees is contrary to law and should be reversed.
 {¶ 19} In a case alleging racial discrimination, the plaintiff bears the initial burden of either presenting direct evidence of racial discrimination, or of establishing a prima facie case of discrimination indirectly by following the standard set forth in McDonnell Douglas Corp. v. Green (1973),411 U.S. 792, 93 S.Ct. 1817; and Byrnes v. LCI Communication HoldingsCo. (1996), 77 Ohio St.3d 125. Peters v. Ohio Dept. of Nat.Resources, Franklin App. No. 03AP-350, 2003-Ohio-5895. In order to establish a prima facie case, the plaintiff must demonstrate that: (1) he belongs to a racial minority; (2) he was discharged from employment; (3) he was qualified for the position; and (4) a comparable, non-protected person was treated more favorably. See, e.g., Ferguson v. Lear Corp. (2003), 155 Ohio App.3d 677, 683, citing Brewer v. Cleveland Bd. of Edn. (1997),122 Ohio App.3d 378, 385; Plumbers Steamfitters Joint Apprenticeship Commt. v. Ohio Civ. Rights Comm.
(1981), 66 Ohio St.2d 192, 197.
 {¶ 20} Once the plaintiff establishes a prima facie case, the burden shifts to the employer to set forth a non-discriminatory reason for the discharge. Once the employer does so, the burden then shifts back to the plaintiff to demonstrate, by a preponderance of the evidence, that the legitimate, non-discriminatory reason was merely a pretext for the impermissible race discrimination. Id.
 {¶ 21} Roxane's first and second assignments of error are related and will be discussed together. Roxane argues that the trial court failed to take sufficient measures to prevent Waddell's introduction of evidence, which Roxane deems "highly prejudicial," and which resulted in a jury verdict based upon passion and prejudice. Roxane also points to specific instances in which it alleges Waddell's trial counsel, by words or actions, inappropriately influenced the jury. Specifically, Roxane cites the following examples:
• The court should not have permitted the introduction of a six-year-old incident in which another female employee, Jennifer Poe ("the Poe incident") had been tied up by two male co-workers and subjected to sexual comments. Roxane charges that Poe never raised allegations of sexual harassment at that time, and that the company's investigation of the incident had resulted in a finding of no sexual harassment, but, instead, concluded it was consensual "horseplay"; therefore, Poe's subsequent suit for sexual harassment and Roxane's failure to terminate the two men accused of sexual harassment could not be used as evidence that Roxane had treated similarly situated white employees more favorably.
• The court should not have allowed into the record testimony by Horsefield regarding details Weaver told her about Weaver's romantic relationships because such evidence inadmissibly put Weaver's character at issue.
• Waddell's trial counsel was improperly permitted to repeatedly pursue a line of questioning regarding the Poe incident, and Weaver's personal life, and that counsel inappropriately attempted to distract the jury by leaving the courtroom at an inopportune time, sitting with Waddell's wife in the gallery, and nodding with the jury in response to one of the court's rulings.
• The court noted but did nothing about inappropriate talking and gesturing by members of the jury; and
• The jury's instruction should not have left open to debate the issue of whether Roxane had a legitimate business reason for firing Waddell because the court's previous summary judgment ruling had stated Roxane had established a legitimate non-discriminatory reason for the firing.
 {¶ 22} In the absence of interrogatories to the jury, which would have tested the basis for the general verdict and the type and amount of damages, it is difficult for this court to determine what evidence the jury accepted or rejected in arriving at its verdict. See, e.g., Clay v. Baltimore Ohio RR. Co.
(Dec. 8, 1986), Warren App. No. CA 85-09-057; Bobb ForestProducts, Inc. v. Morbark Industries, Inc., Belmont App. No. 01 BA 25, 2002-Ohio-5370; accord Miller v. Leesburg (Dec. 1, 1998), Franklin App. No. 97APE10-1379. This is particularly true where, as in the case at bar, appellee alleges that gestures by trial counsel prejudiced the jury in appellee's favor. Roxane alleges that counsel's actions in leaving the courtroom, sitting in the gallery, and nodding with the jury created a distraction which influenced the jury to find for his client; however, it is also possible that the jury either did not notice these actions or found for Waddell despite his counsel's conduct. Although the court admonished counsel regarding some of this conduct, the court concluded the trial with compliments to both sides for their professional behavior. Standing alone, the conduct described was not so egregious as to shock reasonable sensibilities, id., and without an interrogatory, its impact upon the jury is not discernable. Similarly, the evidence elicited regarding Weaver's dating life was not, on its face, so inflammatory as to be an apparent influence upon the jury, and could have been offset by Weaver's own testimony that, at the time of trial, she had married the man she had been dating and they were expecting a child.
 {¶ 23} Regarding the Poe incident, Carnam's testimony included references to a memorandum recommending Waddell's termination in which Carnam utilized the recently-concluded Poe litigation as a reason for Roxane to more vigorously punish harassers. Even though Roxane argued the perpetrators in the Poe incident were not similarly situated because the company had found no sexual harassment had occurred in that case, the fact that the company reached that conclusion despite a factual scenario in which a woman was tied up and suggestive remarks were made, might be admissible as evidence that Roxane was willing to ignore blatant evidence of sexual harassment in a case where the perpetrators were white males. However, we need not reach a conclusion on this point because the Poe incident was not the only example presented by Waddell in support of his position that similarly situated white males had not been terminated for sexual harassment. The Poe incident was not so remote in time nor so dissimilar as to be rendered inadmissible and the jury's verdict was not necessarily predicated solely upon consideration of that incident. Reversible error cannot be based solely upon the court's decision to allow the jury to hear or consider that evidence.
 {¶ 24} In addition to these concerns, Roxane argues the trial court erred in failing to include a crucial sentence in its instructions to the jury. According to Roxane, because the court rendered summary judgment in favor of Roxane on the issue of whether the company had a legitimate business purpose in firing Waddell, it was entitled to have included in the jury instruction a statement that the company, in fact, had such a purpose. The transcript indicates that the trial court read this section of the instruction as it was written by Roxane with the omission of the following sentence: "I instruct you that the Defendant has met its burden of articulating a legitimate non-discriminatory reason for terminating the Plaintiff's employment."
 {¶ 25} When determining whether a trial court erred in its jury instructions, an appellate court reviews the instructions as a whole. Wozniak v. Wozniak (1993), 90 Ohio App.3d 400, 410. "`Ordinarily, requested instructions should be given if they are correct statements of the law applicable to the facts in the case and reasonable minds might reach the conclusion sought by the instruction.'" Murphy v. Carrollton Mfg. Co. (1991),61 Ohio St.3d 585, 591, quoting Markus Palmer, Trial Handbook for Ohio Lawyers (3Ed. 1991) 860, Section 36:2.
 {¶ 26} With regard to objections to jury instructions, Civ.R. 51(A) provides that a party must state with particularity the grounds for the objection and, if a matter is not objected to, that matter may not be the basis of an assignment of error. The rule provides, as follows:
On appeal, a party may not assign as error the giving or the failure to give any instruction unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection. * * *
 {¶ 27} The record in the case at bar indicates that Roxane had an opportunity, both before and after the giving of the instructions, to object to the court's decision to exclude the sentence indicating the issue of Roxane's legitimate business purpose had already been decided. Roxane did not object to the instruction at either time, and so Civ.R. 51 would preclude our finding that this was error.
 {¶ 28} Moreover, even if Roxane were entitled to that instruction and the court did err in excluding it, Roxane has failed to show prejudice under application of the "two-issue rule." That rule has been described as follows:
* * * "* * * [E]rror in the charge of the court dealing exclusively with one of two or more complete and independent issues required to be presented to a jury in a civil action will be disregarded, if the charge in respect to another independent issue which will support the verdict of the jury is free from prejudicial error, unless it is disclosed by interrogatories or otherwise that the verdict is in fact based upon the issue to which the erroneous instruction related. * * *"
Wagner v. Roche Laboratories (1999), 85 Ohio St.3d 457, 460, quoting Bush v. Harvey Transfer Co. (1946), 146 Ohio St. 657, paragraph three of the syllabus.
 {¶ 29} The jury was not presented with interrogatories on the question of whether it found Roxane had a legitimate business purpose for firing Waddell, so it is not possible to know whether the jury so found. In any event, it does not matter because the law clearly indicates, and the jury was instructed, that, regardless of whether Roxane had a legitimate business purpose for firing Waddell, it could still have engaged in racial discrimination. The ultimate question for the jury was not whether Roxane was justified in firing Waddell, but whether the firing arose out of a motive of racial discrimination.
 {¶ 30} Thus, regardless of whether the trial court found Roxane had a legitimate business reason for firing Waddell, it was still a genuine issue of fact whether that finding was rebutted by Waddell's evidence that the legitimate reason was a pretext for racial discrimination. Thus, we overrule Roxane's first and second assignments of error.
 {¶ 31} Roxane's third assignment of error argues that the trial court erred in failing to direct the verdict or grant judgment notwithstanding the verdict on Counts I and III of the complaint, while assignment of error six charges the court should have granted summary judgment for Roxane on these same counts. Because these assignments involve the same counts in the complaint, and because both deal with the merits of Waddell's cause, they will be addressed together.
 {¶ 32} Count I of the complaint states, in part:
14. Defendant, through the acts of its management, subjected the Plaintiff to racially discriminatory disparate treatment by terminating him for an unproven and insufficient allegations [sic] without allowing him to answer to the validity or seriousness of those allegations.
15. Similarly situated White personnel have, in the past, not been treated similarly in such situations.
16. Plaintiff's version of the events was not even solicited by Defendant because he was African American, while Ms. Weaver's version of the events was believed because she was White.
17. Defendant also terminated Plaintiff because of their prejudice against miscegenation (interracial sexual contact).
18. Plaintiff is entitled to compensatory damages, punitive damages, and attorneys' fees for this discrimination, in an amount to be determined at trial, but in any event not less than $500,000.00.
 {¶ 33} Count III of the complaint provides, in part:
30. Defendant, through the acts of its management, subjected the Plaintiff to discriminatory disparate treatment due to the combination of his race and gender by terminating him for an unproven and insufficient allegations [sic] without allowing him to answer to the validity or seriousness of those allegations.
31. Plaintiff's version of the events was not even solicited by Defendant because he was African American male, while Ms. Weaver's version of the events was believed because she was White female.
32. Defendant also terminated Plaintiff because of their prejudice against sexual contact between African American males and White females, and their belief in the predatory nature of African American males.
33. Plaintiff is entitled to compensatory damages, punitive damages, and attorneys' fees for this discrimination, in an amount to be determined at trial, but in any event not less than $500,000.00.
 {¶ 34} "A directed verdict may be granted when `the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party.' Civ.R. 50(A)(4). * * * [A] motion for a directed verdict must be denied when `substantial, competent evidence has been presented from which reasonable minds could draw different conclusions.'" Kroh v. Continental Gen. Tire,Inc. (2001), 92 Ohio St.3d 30, 31. The same test applies to a trial court's consideration of a motion for judgment notwithstanding the verdict. Posin v. A.B.C. Motor Court Hotel
(1976), 45 Ohio St.2d 271.
 {¶ 35} Appellate review of summary judgment motions is de novo. Helton v. Scioto Cty. Bd. of Commrs. (1997),123 Ohio App.3d 158, 162. "When reviewing a trial court's ruling on summary judgment, the court of appeals conducts an independent review of the record and stands in the shoes of the trial court."Mergenthal v. Star Banc Corp. (1997), 122 Ohio App.3d 100, 103. Civ.R. 56(C) provides that summary judgment may be granted when the moving party demonstrates that: (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made. State ex rel.Grady v. State Emp. Relations Bd. (1997), 78 Ohio St.3d 181,183. However, where error in a summary judgment decision by the trial court is alleged after the matter has been tried, this court's review must be mindful that "[a]ny error * * * is rendered moot or harmless if a subsequent trial on the same issues raised in the motion demonstrates that there were genuine issues of material fact supporting a judgment in favor of the party against whom the motion was made." Continental Ins. Co. v.Whittington (1994), 71 Ohio St.3d 150, syllabus.
 {¶ 36} Both the third and sixth assignments of error involve consideration of the sufficiency of the evidence as a matter of law; in other words, did Waddell present sufficient evidence which, if believed, would support his claim that Roxane's decision to fire him was racially motivated? In reviewing this question, we are bound to consider the evidence in a light most favorable to Waddell.
 {¶ 37} Inasmuch as appellant's termination arose out of allegations of sexual harassment and resulted in an action for racial discrimination, the facts in the case at bar resemble those set forth in Griffin v. MDK Food Services, Inc., Cuyahoga App. No. 82314, 2004-Ohio-133, an Eighth District Court of Appeals case in which Michael Kafantaris, the defendant owner of a Denny's Restaurant franchise in Cleveland, appealed a jury verdict in favor of Robert Griffin, an African-American restaurant manager whose suit alleged that racial discrimination motivated his termination. Although several co-workers had testified that Griffin sexually harassed them, providing the legitimate business reason for his termination, Griffin presented evidence that Kafantaris had paid co-workers to fabricate the sexual harassment allegations, had hired other employees to vandalize Griffin's car, and had rehired an employee whom Griffin had fired for referring to Griffin using a racial epithet. The matter was submitted to a jury, which returned a verdict in Griffin's favor, awarding him $100,000 in compensatory damages and $500,000 in punitive damages, plus attorney fees. In affirming the verdict, the appellate court stated, in part:
* * * We are bound to view the evidence in a light most favorable to the plaintiff. * * *
Kafantaris denied these allegations and defendants did, in fact, present a legitimate, non-discriminatory reason for plaintiff's termination; that being the repeated complaints that plaintiff [sexually] harassed young female servers. Plaintiff rebutted this reason by offering evidence that defendant paid these women to fabricate the allegations against plaintiff.
Defendants question why Kafantaris would twice offer plaintiff a job only to fire him in an elaborate scheme of racial discrimination. That was, however, a question facing the jury. We are not at liberty to weigh the evidence. The record contains conflicting evidence on nearly every material issue as we have summarized in some detail above. It matters not what version of the evidence we would have believed but only that the record contains some evidence that, if believed, would support plaintiff's claim. The record does contain such evidence and for that reason we find that the trial court did not err in overruling defendants' motions for directed verdict and for judgment notwithstanding the verdict.
 {¶ 38} In a case addressing the issue of gender discrimination, the Ohio Supreme Court has similarly stated:
 To be sure, counsel for [defendant] presented ample evidence supporting their arguments. It is even possible that they presented more and better evidence. However, our task is not to weigh the evidence. We conclude that substantial, credible evidence was presented from which reasonable minds could draw different conclusions. * * *
Kroh, at 32.
 {¶ 39} In rejecting Roxane's bid for a judgment notwithstanding the verdict, the trial court summarized Waddell's evidence in support of his contention that similarly situated white employees had been given more favorable treatment. In its decision and entry denying Roxane's motion for judgment notwithstanding the verdict, the trial court determined that the Poe incident did not qualify as an example of similarly situated white males who were treated more favorably than Waddell. The court also found that Waddell had not presented sufficient evidence from which the jury could conclude that the "Farmer" incident bore any similarity to Waddell's termination. In that incident, which was not determined by Roxane to be sexual harassment, female employee Socheat Molla complained that, after she broke off a relationship with Larry Farmer, white male co-workers refused to speak to her and notified her husband she had had an affair. However, the court did find that a second incident involving Farmer, in which Carrie Yoder reported that Farmer repeatedly had made sexually-oriented comments and asked inappropriate personal questions, did raise a question of fact for the jury, since Farmer, a white male, was given only a verbal warning. The court also found Waddell had presented sufficient evidence to raise a question of fact in the matter of Jerry Lockart, in which Jana Altop reported that Lockart became threatening, telephoned her repeatedly, and allegedly attempted to run her car off the road. Despite a recommendation from Carnam that Lockart be terminated, in that instance Roxane only issued a second-level written warning. Finally, the court determined that the matter of Paul Minarik, although it arose some eight months after Waddell's termination, merited submission to the jury because, although Minarik had been accused by several female employees of regularly making sexually-oriented comments, the company did not terminate him, but, rather, issued a second-level written warning.
 {¶ 40} The court concluded that Waddell had identified at least three non-protected employees whom the jury could determine were similarly situated, yet whose employment had not been terminated, and that Waddell, thus, had met his burden of establishing a prima facie case of racial discrimination.
 {¶ 41} In response to Roxane's argument that the evidence overwhelmingly supported its position that its sole reason for terminating Waddell was a good-faith belief that he had engaged in sexual harassment, the court stated:
The Court has expended a great deal of thought on this issue, including thoroughly reviewing the evidence and testimony presented. Having had the opportunity to hear the witness' testimony and observe their demeanor, the Court is compelled to note that it viewed this case differently than the jury did.
However, this Court's role during the trial was not as the trier of fact. Here too, the Court must not consider the weight of the evidence, nor the credibility of the witnesses. Rather, the Court can only sustain Defendant's Motion if it determines that the jury could have only reached a conclusion that was adverse to Plaintiff. The Court finds that such a determination cannot be made.
Construing the evidence and all reasonable inferences that can be drawn therefrom in favor of Plaintiff, the Court finds that reasonable minds could conclude that Defendant's articulated legitimate business reason was merely a pretext for discrimination. * * *
 {¶ 42} Upon a review of the record, we agree with the trial court that Waddell submitted substantial, credible evidence from which reasonable minds could draw different conclusions, and, thus, the jury's verdict should not be disturbed, and that summary judgment in favor of Roxane would not have been well-taken. Roxane's third and sixth assignments of error are overruled.
 {¶ 43} Roxane's fourth and fifth assignments of error argue that the punitive damages award was unsupported by clear and convincing evidence of actual malice and violated due process because the trial court should not have admitted evidence of dissimilar conduct.
 {¶ 44} It is well-settled that R.C. 4112.99 permits an award of punitive damages in a discrimination claim. Rice v.CertainTeed Corp. (1999), 84 Ohio St.3d 417. The test to be applied in determining whether a punitive damages award is appropriate has been articulated by this court:
A plaintiff is not automatically entitled to an award of punitive damages upon proof of a violation of Ohio's anti-discrimination provisions. As noted by the Supreme Court inRice, supra, at 422, * * * Ohio law provides that punitive damages may be awarded only upon a finding of actual malice. * * * "Actual malice, necessary for an award of punitive damages, is (1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or
(2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." (Emphasis sic.) Preston v. Murty (1987),32 Ohio St.3d 334 * * *. Moreover, the burden is on the plaintiff to establish actual malice by clear and convincing evidence. R.C.2315.21(D)(2). Finally, unlike compensatory damages, the jury is given wide discretion in determining whether punitive damages are justified and in assessing the amount of such damages based upon its collective judgment as to the punitive and deterrent effect that such an award would have. * * *
Toole v. Cook (May 6, 1999), Franklin App. No. 98AP-486.
 {¶ 45} In its decision on Roxane's motion for judgment notwithstanding the verdict on the punitive damages award, the trial court stated:
Upon review, the Court finds that Plaintiff provided sufficient evidence from which a jury could conclude that Defendant acted either with ill-will or with a conscious disregard of his rights. Defendant argues that the evidence clearly indicated that it terminated Plaintiff solely based upon a good faith belief that he had violated its sexual harassment policy. Although Defendant did articulate a legitimate business reason for terminating Plaintiff's employment, the jury clearly rejected that position and instead found that Plaintiff's termination was racially motivated.
To establish that he had been racially discriminated against, Plaintiff argued to the jury that Defendant completely disregarded evidence concerning Ms. Weaver's lack of honesty and veracity as well as the fact that she had a motive to lie in order to divert attention from her performance problems. For instance, Plaintiff proved that Defendant had declined to place into Ms. Weaver's personnel file a memorandum written by Nancy Horsefield, who was Ms. Weaver's immediate supervisor at the time of Plaintiff's termination. In the memorandum, Ms. Horsefield detailed performance problems she had experienced with Ms. Weaver. Defendant set forth a plausible explanation as to why it believed that memorandum should not be placed within Ms. Weaver's file. However, Ms. Horsefield testified that it was her understanding that the Defendant's purpose was "to sanitize the files in the event that [Plaintiff] filed a racial discrimination suit against the company." * * *
The Court finds that the jury could conclude from such evidence that Defendant acted with actual malice. This is a reasonable inference that can be made from the evidence presented by Plaintiff, which was obviously found to be credible by the jury.
 {¶ 46} We agree with the trial court that Roxane's rejection of Horsefield's memo, the comments about the "sanitization" of the file, and Carnam's suggestion that the company was more preoccupied with preventing a sexual harassment suit by Weaver than with protecting Waddell's rights, all constituted sufficient material evidence on the issue of whether there was actual malice by Roxane as to create a factual question for the jury. Moreover, under these facts, the amount of the punitive damages award, $250,000, is not grossly excessive or arbitrary so as to constitute an arbitrary deprivation of property in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution. See, generally, State Farm Mut. Auto. Ins.Co. v. Campbell (2003), 538 U.S. 408. Thus, we overrule Roxane's fourth and fifth assignments of error.
 {¶ 47} Roxane's seventh assignment of error argues that the award of attorney fees in this case is contrary to law and should be reversed. Specifically, Roxane claims that, even if the punitive damages award is upheld, the award is adequate to compensate Waddell for attorney fees.
 {¶ 48} An award of attorney fees is a matter within the sound discretion of the trial court. Layne v. Layne (1992),83 Ohio App.3d 559, 568. Thus, an award for attorney fees will not be overturned on appeal absent an abuse of discretion. MotoristsMut. Ins. Co. v. Brandenburg (1995), 72 Ohio St.3d 157, 160. A reviewing court will not disturb the judgment unless it reflects an arbitrary, unreasonable, or unconscionable attitude.Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219.
 {¶ 49} Having reviewed the post-verdict decisions and entries in this matter, we find nothing to support the view that the trial court's decision to award attorney fees was arbitrary, unreasonable, or unconscionable, given the jury verdict in this matter. We therefore overrule Roxane's seventh assignment of error.
 {¶ 50} Roxane's assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.
Judgment affirmed.
 Petree and Sadler, JJ., concur.