EASTMAN, Appellee,

v.

The STANLEY WORKS et al., Appellant.

[Cite as *Eastman v. Stanley Works,* 180 Ohio App.3d 844, 2009-Ohio-634.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 08AP–197.

Decided Feb. 12, 2009.

**848**

Lamkin, Van Eman, Trimble, Beals & Dougherty, L.L.C., Timothy L. Van Eman, and Keri N. Yaeger, for appellee.

Gallagher Sharp, Joseph W. Pappalardo, Kristen L. Wedell, and Colleen A. Mountcastle, for appellant The Stanley Works.

---

SADLER, Judge.

{¶ 1} Defendant-appellant, The Stanley Works, appeals from the judgment of the Franklin County Court of Common Pleas, entered upon a jury verdict finding appellant liable on the claims of plaintiff-appellee, Shawn L. Eastman, for strict product liability and negligence.

{¶ 2} Appellant manufactures tools, including the tool subject of this case, the Stanley Fat Max 22 hammer ("FM22"). Appellee is a framing carpenter who was injured on April 23, 2004, when one of the claws of his FM22 broke off, flew into his left eye, and ruptured his left eyeball. Appellee's injuries resulted in permanent disfigurement and vision loss in the left eye. Appellee filed the instant action against appellant, alleging claims of both strict product liability for defective manufacturing under R.C. 2307.73(A)(1) and 2307.74, and common law negligence. On December 17, 2007, following a week-long trial, the jury found in appellee's favor on both claims.

{¶ 3} We begin by recapitulating the relevant facts adduced below. Appellee is a framing carpenter by trade and had been working in that trade for ten years at the time of the accident. Appellee's work involved continuous use of a hammer. He estimated that he makes at least 300 strikes with his hammer per day. He would also use the claw end of his hammer to break the metal straps used to secure bundles of roof trusses. Appellee testified that this is a common and accepted practice among framing carpenters. Appellant's in-house engineer, Steven Crosby, and its manager of products support, Steven Gemmall, both corroborated appellee's testimony that this is an acceptable use for a hammer like the FM22.

{¶ 4} In January 2004, appellee began using the FM22 at issue. Then, on April 23, 2004, while attempting to break a metal strap on a bundle of roof trusses, one of the claws of appellee's FM22 broke off, flew into appellee's left

eye, and ruptured the eyeball. At the time of his accident, appellee was not wearing safety goggles. He testified that this was because the day was rainy and the ground was muddy, and he could not see through the goggles as a result. His co-worker testified that the rainy and muddy conditions on the day in question would cause rain and mud to build up on the goggles and would cause the goggles to fog.

{¶ 5} Appellee conceded that it is always safer to wear safety goggles when using a hammer. Appellee conceded that the FM22 bore a sticker warning that users should wear safety goggles because "tools or struck objects may chip." However, he stated that because he was not using the FM22 to strike an object, he did not anticipate the danger of the tool chipping. Gemmall conceded that appellee's FM22 did not "chip" and that an entire claw snapped off. He agreed that appellant did not warn users about the risk of an entire claw snapping off with force sufficient to rupture the user's eyeball. Gemmall also testified that he did not expect users to anticipate such a risk when deciding whether safety goggles were necessary.

{¶ 6} Engineer Greg Dubois testified as an expert on behalf of appellee. He examined and tested appellee's FM22. He concluded that the FM22 had experienced a "quench crack," which means that it had developed a crack as a result of not being properly cooled after being heat-treated. Gemmall agreed that a quench crack would be a manufacturing defect. One of the reasons that Dubois felt there had been a quench crack was, he stated, that there was evidence of intergranular failure. However, he did not have any photographic evidence of this.

{¶ 7} Crosby, a metallurgical expert, agreed that there had been a crack in appellee's FM22, but he testified that there is no metallurgical evidence that it was a quench crack. First, he explained that the so-called intergranular failure, upon which Dubois had based his opinion, was evidence of a "ductile rupture failure," which is inconsistent with a quench crack. Crosby also explained that a quench crack would be located at the "V," or "crotch," formed by the hammer and the claw, while the crack in appellee's FM22 was located at the "shear lip," which is "further down" from the crotch than a quench crack would be located.

{¶ 8} Crosby's theory was that the FM22 cracked and broke due to appellee's misusing and abusing the hammer. When it was brand new, the FM22's head had a checkered face covered with pyramid-like shapes for a better grip on struck objects. At the time of the accident, the checkers or pyramids were completely gone, and the face was smashed completely flat. Both Dubois and Crosby opined that this was a deformed hammer. Crosby opined that such deformity would not be expected on a hammer used only for framing purposes, though he admitted that appellant has not tested the FM22 to determine what it "should" look like

after normal use by a framing carpenter. Appellee testified that it usually takes about two years for a hammer's head to become completely flat. He denied abusing the FM22 in the three-month period in which he had used it. Dubois testified that another of appellee's hammers, which had not been manufactured by appellant, was worn flat and was cracked. Crosby testified that abuse of a hammer can lead to a crack, which can cause separation of a claw.

{¶ 9} Dubois's file on this case contained a rule promulgated by the American Society of Mechanical Engineers ("ASME"), which stated that "nail hammers shall not be used to strike hard or hardened objects such as rocks, bricks, concrete, masonry nails * * *." Appellee had admitted that he routinely used the FM22 to strike concrete nails. The trial court refused to allow appellant to cross-examine Dubois about this ASME standard because it was written by and for engineers, not hammer users. The court concluded, therefore, that the rule was not binding upon appellee. The court also noted that the FM22 contained no manufacturer's warning against using the FM22 on masonry nails. Appellant put the standard into the record by proffer.

{¶ 10} Robert St. John is appellant's director of engineering for its consumer-tools division. He testified that he has personally observed the manufacturing procedures that are used in the Taiwanese plant in which appellee's FM22 was made. He stated that the plant's manufacturing procedures complied with appellant's specifications for the FM22. He further testified that quality engineers audit and process every shipment of Stanley hammers that leaves the factory. He testified that appellant's written procedures and specifications call for testing of each hammer to ensure the absence of quench cracks. However, the only evidence he produced showing that testing had actually been performed was his testimony that he observed compliance with the written procedures and specifications during his numerous visits to the Taiwanese manufacturing facility. He admitted on cross-examination that he did not have any documents to corroborate testing of appellee's FM22.

{¶ 11} Following his injury, appellee underwent two surgeries and suffered permanent vision loss. Appellee returned to work in July 2004, with no restrictions. He later re-injured his eye in an incident unrelated to the present action, and that injury caused him not to work from November 27, 2004, through December 2004. Until a few days before trial, he had not seen an ophthalmologist since May 2005.

{¶ 12} Appellee has worked continuously since January 2005. At the time of trial, he worked full-time, which, he explained, is not 52 weeks per year and 40 hours per week in the construction business; rather, because his portion of construction occurs outdoors, it is subject to changes in seasons and weather. At the time of his injury, appellee was earning $10 per hour. At the time of trial, he

was earning $14 per hour and had been earning that rate of pay for two years preceding the trial.

{¶ 13} Appellee's witness, Dr. Bruce Growick, a vocational rehabilitation expert, reviewed appellee's educational and work history, and his physical abilities and eye impairment. Based on this information, Dr. Growick opined that appellee is qualified to perform only 15 to 20 percent of the unskilled jobs for which he had been qualified prior to the incident in question. Dr. Growick acknowledged that appellee is presently working in his former position; therefore, that position is not among the 80 to 85 percent of jobs for which appellee is no longer qualified as result of his injury. He also admitted that it would be speculative to state that appellee would be unable to perform his job at a particular point in the future.

{¶ 14} Dr. Richard Palfin is an economist who testified on appellee's behalf. Dr. Palfin reviewed documentation of appellee's pre- and post-injury earnings, his medical records, and Dr. Growick's vocational analysis. Based upon all of those records, Dr. Palfin calculated the present value of the annual percentage of appellee's lost earning capacity. On cross-examination, he conceded that he had based his annual earnings calculation on a 52–week year. He also testified that he had not taken into account the seasonal nature of appellee's work and the fact that appellee's work weeks were not uniformly 40–hour weeks. Therefore, Dr. Palfin had used an annual future wage of $29,120, while appellee's annual salary prior to the accident was only $21,350.03. Dr. Palfin did not assign a starting year for when appellee would experience loss of earning capacity; rather, he stated, it would be up to the jury to determine when appellee would actually begin to experience any loss of earning capacity.

{¶ 15} The jury awarded compensatory damages in the amount of $986,300, including $60,300 for past economic loss, $200,000 for past noneconomic loss, $426,000 for future economic loss, and $300,000 for future noneconomic loss. The jury further determined that appellee was 35 percent negligent and that his negligence was a proximate cause of his injury. The court entered judgment in appellee's favor in the amount of $986,300. Appellant filed post-trial motions for judgment notwithstanding the verdict ("JNOV"), and for a new trial or remittitur. The trial court denied the motions.

{¶ 16} Appellant timely appealed and advances seven assignments of error for our review, as follows:

I.   The trial court erred in denying the Stanley Works' motion for judgment notwithstanding the verdict, pursuant to Civ.R. 50(B), because the evidence does not support the damages element of Shawn Eastman's claims.

II.   The trial court abused its discretion and erred as a matter of law in admitting the testimony of Palfin and Growick.

III.   The trial court erred in denying Stanley Works' motion for directed verdict.

IV.   The trial court erred by refusing to provide an assumption of the risk jury instruction regarding strict liability and erred in instructing the jury to ignore the unforeseeable use of the hammer by Mr. Eastman, a sophisticated user.

V.   The trial court erroneously refused to allow Stanley Works to admit the American Society of Mechanical Engineer's [sic] standard for nail hammers—safety requirements, B107.0R 1 M–1997, as approved by ANSI.

VI.   Remittitur of the excessive jury award is warranted.

VII.   The trial court erred in denying appellant's motion for new trial pursuant to Civ.R. 59(A).

{¶ 17} In its first assignment of error, appellant argues that the trial court erred in denying its motion for JNOV.   A motion for JNOV is made pursuant to Civ.R. 50(B).   "The standard for a motion for judgment notwithstanding the verdict pursuant to Civ.R. 50(B) is the same as that for a motion for a directed verdict pursuant to Civ.R. 50(A)."   *Estate of Cowling v. Estate of Cowling*, 109 Ohio St.3d 276, 2006-Ohio-2418, 847 N.E.2d 405, ¶ 28.   Civ.R. 50(A)(4) provides, "When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue."

{¶ 18} "[I]t is well established that the court must neither consider the weight of the evidence nor the credibility of the witnesses in disposing of a directed verdict motion.   * * * Thus, 'if there is substantial competent evidence to support the party against whom the motion is made, upon which evidence reasonable minds might reach different conclusions, the motion must be denied.' " (Citations omitted.)   *Cowling*, 109 Ohio St.3d 276, 2006-Ohio-2418, 847 N.E.2d 405, at ¶ 31, quoting *Strother v. Hutchinson* (1981), 67 Ohio St.2d 282, 284–285, 21 O.O.3d 177, 423 N.E.2d 467.   "[T]he motion raises a question of law because the motion examines the materiality of the evidence, as opposed to the conclusions to be drawn from the evidence.   Because the motion for judgment notwithstanding the verdict presents a question of law, we review de novo the trial court's decision on the motion."   (Citations omitted.)   *Duffer v. Powell*, Franklin App. No. 05AP–859, 2006-Ohio-2613, 2006 WL 1431469, ¶ 29.

{¶ 19} In support of its motion for JNOV, appellant argued that appellee failed to present sufficient evidence to support the jury's award of future economic damages proximately caused by the defect in the FM22. It argued that the

testimony of Drs. Growick and Palfin was too speculative to establish calculable financial loss and a causal connection between such loss and the defect (for the strict product liability claim) or appellant's negligence (for the common law negligence claim). Appellant argued that this insufficient expert testimony coupled with the fact that appellee has returned to his former full-time position, precludes recovery of future economic damages. The trial court rejected these arguments.

{¶ 20} Appellant makes the same arguments to this court in support of its first assignment of error. In response, citing *Day v. Gulley* (1963), 175 Ohio St. 83, 23 O.O.2d 382, 191 N.E.2d 732, appellee argues that "loss of any eye is, according to Ohio law, an objective injury" and the jury properly concluded appellee's impairment from that fact alone. It is undisputed on appeal that appellee proved the permanency of his injury. However, *Day* does not stand for the proposition that any objective injury relieves the plaintiff of the burden to prove the existence of a reasonably certain amount of future economic damages causally related to that impairment. In *Day,* the court discussed objective injuries as part of its holding that such an injury permits the "jury [to] draw their conclusions as to future pain and suffering from that fact alone[,]" without expert testimony. *Day* at 86, 23 O.O.2d 382, 191 N.E.2d 732. The court in *Day* was discussing damages for *pain and suffering,* which are *noneconomic* damages. Indeed, the jury in the present case awarded appellee $300,000 for the future *noneconomic* damages he will suffer as a result of his objective, permanent impairment. Appellant does not challenge, and we do not disturb, the jury's award to appellee of damages for his future pain and suffering. Because appellant's first assignment of error addresses appellee's claim for future *economic* damages and does not involve appellee's damages for future pain and suffering, appellee's citation of *Day* is misplaced.

{¶ 21} R.C. 2315.18(A)(2) provides that, for purposes of tort actions, "economic loss" means:

(a) All wages, salaries, or other compensation lost as a result of an injury or loss to person or property that is a subject of a tort action;

(b) All expenditures for medical care or treatment, rehabilitation services, or other care, treatment, services, products, or accommodations as a result of an injury or loss to person or property that is a subject of a tort action;

(c) Any other expenditures incurred as a result of an injury or loss to person or property that is a subject of a tort action, other than attorney's fees incurred in connection with that action.

Appellee's claim for future economic damages falls under subparagraph (a) because he seeks compensation for "lost wages, salaries or other compensation." Thus, in order to resolve this assignment of error, we must determine whether the trial court properly concluded that appellee had presented "substantial

competent evidence"[1] that he will experience a loss of future "wages, salaries or other compensation" that was proximately caused by his injury.

{¶ 22} The Supreme Court of Ohio has explained, "The measure of damages for impairment of earning capacity is *the difference between the amount which the plaintiff was capable of earning before his injury and that which he is capable of earning thereafter.*" (Emphasis added.) *Hanna v. Stoll* (1925), 112 Ohio St. 344, 353, 3 Ohio Law Abs. 250, 147 N.E. 339; see also *Deyo v. Adjutant General's Dept.* (Aug. 16, 1994), Franklin App. No. 93API12–1667, 1994 WL 425003.

{¶ 23} In the case of *Power v. Kirkpatrick* (July 20, 2000), Franklin App. No. 99AP–1026, 2000 WL 992028, this court expounded on the concept of impairment of earning capacity:

> An award of damages for future wage loss raises two independent evidentiary concerns: (1) whether [the plaintiff] offered sufficient proof of any future impairment; and (2) whether [the plaintiff] offered sufficient evidence of the extent of prospective damages flowing from the impairment.

{¶ 24} As for the first inquiry, it is undisputed that appellee presented sufficient proof of his future, permanent impairment. Thus, we must focus our attention on the second inquiry—whether appellee presented sufficient proof that he is reasonably certain to incur a loss in the future of "wages, salaries or other compensation" as a result of his impairment.

{¶ 25} Appellant cites *Power,* Franklin App. No. 99AP–1026, 2000 WL 992028, in which this court explained:

> In order to recover future damages, including future wage loss, [the plaintiff] must prove by sufficient evidence that he is reasonably certain to incur such damages in the future. *Galayda v. Lake Hosp. Sys., Inc.* (1994), 71 Ohio St.3d 421, 425, 644 N.E.2d 298. Therefore, *the showing of future loss of earnings in a personal injury case involves demonstrating with reasonable certainty that an individual's injury or condition prevents that individual from attaining his or her pre-injury wage.*

(Emphasis added.) See also *Broadstone v. Quillen,* 162 Ohio App.3d 632, 2005-Ohio-4278, 834 N.E.2d 424, ¶ 19 ("the showing of future loss of earnings in a personal injury case involves demonstrating with reasonable certainty that an individual's injury or condition prevents that individual from attaining his or her pre-injury wage"); *Ratliff v. Colasurd* (Apr. 27, 1999), Franklin App. No. 98AP–504, 1999 WL 253002, *15 ("The showing of future earnings loss in a personal injury case therefore involves demonstrating with reasonable certainty, first, that

---

1. *Cowling,* 109 Ohio St.3d 276, 2006-Ohio-2418, 847 N.E.2d 405, at ¶ 31.

appellee's injury or condition prevents him from attaining his or her pre-injury wage").

{¶ 26} Appellant argues that appellee's expert witnesses never established, with reasonable certainty, that the amount of wages that appellee will be capable of earning over his working life after his injury is less than the amount of wages he was capable of earning over his working life before his injury. In response, appellee argues that he did provide sufficient proof of future wage loss and cites the case of *Deyo*, Franklin App. No. 93API12–1667, 1994 WL 425003, apparently because in *Deyo*, we upheld a jury's award for future economic damages under R.C. 2315.18(A)(2)(a), where, as here, the record contained an economist's testimony quantifying a loss of future earning capacity.

{¶ 27} However, that case is distinguishable because, as appellee notes, the plaintiff in *Deyo* was injured in such a way that he was incapable of performing his previous nonsedentary job and was restricted to sedentary work, which his former employer could not provide. The plaintiff presented an expert who opined that the plaintiff could be expected to earn quantifiably less in the future, performing the sedentary work for which he was qualified, than he was capable of earning before his injury, when he was not restricted to sedentary employment. That is, he presented evidence as to the difference between what he would have earned during the remainder of his working life had he not been injured, and the amount he was *reasonably certain to earn* over the same period in the sedentary work to which his injury had confined him.

{¶ 28} Here, unlike in *Deyo*, appellee is not restricted to sedentary employment; indeed, he has returned to his former position with no restrictions, his physician has placed no medical restrictions on any future employment, and Dr. Growick testified that he cannot say, with any reasonable degree of certainty, that appellee's injury will render him unable to perform the functions of his job at any point in the future. Appellee's economist, Dr. Palfin, testified that the dollar amount he assigned to appellee's lost earning capacity (based on a 2007 earning capacity of $14 per hour and an expected retirement age of 65), should be reduced for any amount of time in which appellant works. He explained that this is because his calculation of the present value of appellee's future economic loss ($646,160) is entirely based upon the assumption that appellee would *not be working* at any time from the date of trial to the end of his normal working life.

{¶ 29} Moreover, though Dr. Growick testified that appellee's injury renders him incapable of performing 80 to 85 percent of jobs for which he was qualified prior to his injury, Dr. Growick never said that any of the jobs that appellee has lost the opportunity to pursue would have paid him the same or more "wages, salaries or other compensation" than he has actually been earning since his accident. Only if the loss of those job opportunities quantifiably reduced "the

amount which [appellee] was capable of earning before his injury"[2] will he have proven with reasonable certainty that he has suffered future economic losses. No expert testified to any such reduction in earning capacity.

{¶ 30} The dissent expresses concern that our analysis is improperly focused on the fact that appellee returned to his former position of employment and earned more at the time of trial than he earned three and a half years earlier, at the time of his injury. It is true that evidence of appellee's current work situation is relevant. But his return to his former position does not, ipso facto, prevent his recovery of future economic damages under R.C. 2315.18(A)(2)(a). Rather, appellee did not meet his burden of proof of this element of damages because his experts' opinions as to his lost earning capacity were fundamentally flawed. First, the opinions were based upon the hypothetical situation of appellee's being unemployed, despite the fact that he had been steadily employed since his recovery, and as Dr. Growick acknowledged, it would constitute speculation to presume that appellee would lose his job or be unable to work at some point in the future. Second, there is no evidence that attributed any quantifiable reduction in appellee's wage-earning capacity to his loss of potential occupations.

{¶ 31} The deficiency of the evidence in this case is illustrated by the case of *Hall v. Kreider Mfg., Inc.*, Franklin App. No. 03AP–272, 2003-Ohio-6661, 2003 WL 22927416. In that case, the plaintiff was a dentist who claimed that his wrist injury permanently foreclosed his ability to perform extractions, which were a quantifiable source of part of his income. We determined that the plaintiff's medical evidence failed to establish the permanency of his impairment; however, if he had been able to establish that his injury was permanent, then he could have proven his claim for future economic damages by presenting an expert to quantify, with reasonable certainty, the amount of "wages, salaries or other compensation" that he would have lost as a result of being unable to perform extractions for the remainder of his working life.

{¶ 32} Our analysis does not preclude future economic-damage claims based upon R.C. 2315.18(A)(2)(a) in the hypothetical case of a physician turned winery proprietor, mentioned by the dissent. In such a case, if the medical and vocational evidence established with reasonable certainty that the physician's permanent impairment precluded him from future performance as a physician, then that plaintiff could recover future economic damages once his economic expert placed a present value on such losses by opining as to a negative mathematical difference between the plaintiff's pre-injury and post-injury earning capacity. In that hypothetical, just as in the present case, future economic

---

2. *Hanna v. Stoll* (1925), 112 Ohio St. 344, 353, 3 Ohio Law Abs. 250, 147 N.E. 339.

damages are available, but must be proved with reasonable certainty. The evidence in this case is insufficient to establish, with reasonable certainty, that there is a "difference between the amount which the plaintiff was capable of earning before his injury and that which he is capable of earning thereafter[,]"[3] or that appellee's injury "prevents [him in the future] from attaining his * * * pre-injury wage."[4]

{¶ 33} As we noted earlier, we must review de novo the trial court's decision on a motion for JNOV. Having done so, and construing the evidence in the light most favorable to appellee, we find that reasonable minds could come to but one conclusion on the issue of future economic damages, and that conclusion is adverse to appellee. Accordingly, the trial court erred in submitting the issue to the jury. For this reason, appellant's first assignment of error is sustained, and its second assignment of error is overruled as moot.

{¶ 34} In its third assignment of error, appellant argues that the trial court erred in denying appellant's motion for a directed verdict on both the product-liability claim and the negligence claim. The Supreme Court of Ohio has set forth the standard appropriately applied to review of a decision to grant or deny a directed verdict:

According to Civ.R. 50(A)(4), a motion for directed verdict is granted if, after construing the evidence most strongly in favor of the party against whom the motion is directed, "reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party." The "reasonable minds" test mandated by Civ.R. 50(A)(4) requires the court to discern only whether there exists any evidence of substantive probative value that favors the position of the nonmoving party.

A motion for directed verdict * * * does not present factual issues, but a question of law, even though in deciding such a motion, it is necessary to review and consider the evidence. Since we are presented with a question of law, we apply a de novo standard of review.

(Citations omitted.) *Goodyear Tire & Rubber Co. v. Aetna Cas. & Sur. Co.*, 95 Ohio St.3d 512, 2002-Ohio-2842, 769 N.E.2d 835, ¶ 3–4.

{¶ 35} Appellee brought two claims against appellant—strict product liability under R.C. 2307.73 and common law negligence. R.C. 2307.73(A) provides, "A manufacturer is subject to liability for compensatory damages based on a product liability claim only if the claimant establishes, by a preponderance of the evidence * * * (1) Subject to division (B) of this section, the manufacturer's product in

---

3. *Hanna v. Stoll*, 112 Ohio St. 344, 353, 3 Ohio Law Abs. 250, 147 N.E. 339.

4. *Power v. Kirkpatrick*, Franklin App. No. 99AP–1026, 2000 WL 992028.

question was defective in manufacture or construction as described in section 2307.74 of the Revised Code." R.C. 2307.74 provides:

> A product is defective in manufacture or construction if, when it left the control of its manufacturer, it deviated in a material way from the design specifications, formula, or performance standards of the manufacturer, or from otherwise identical units manufactured to the same design specifications, formula, or performance standards. A product may be defective in manufacture or construction as described in this section even though its manufacturer exercised all possible care in its manufacture or construction.

The elements of appellee's negligence claim are (1) the existence of a duty to appellee, (2) breach of that duty, (3) damages proximately resulting therefrom. *Jeffers v. Olexo* (1989), 43 Ohio St.3d 140, 142, 539 N.E.2d 614.

{¶ 36} Appellant argues that the trial court should have granted it a directed verdict on the strict product liability claim because appellee did not prove that the FM22 was defective in manufacture and on the negligence claim because appellee did not prove that appellant breached its duty to appellee, all because he failed to prove that the FM22 in question had a quench crack. Citing the testimony of its own expert—Crosby—appellant argues that the claw broke in the wrong place for there to have been a quench crack present; there was a ductile pulling fracture, which is inconsistent with a quench crack; and there was no photographic evidence of a quench crack.

{¶ 37} Appellant ignores the fact that the jury was presented with Crosby's testimony on behalf of appellant, and Dubois's testimony on behalf of appellee. The two experts differed on whether the FM22 had a quench crack when it left appellant's hands, and whether this caused the claw to snap off while appellee was using it. "Where conflicting expert testimony exists, the trier of fact is responsible for determining which expert is more credible." *Parsons v. Washington State Community College*, Franklin App. No. 05AP–1138, 2006-Ohio-2196, 2006 WL 1174501, ¶ 22. This is because "[t]he weight of conflicting expert evidence and the credibility of the experts are matters peculiarly for the trier of fact." *Bedel v. Univ. of Cincinnati Hosp.* (1995), 107 Ohio App.3d 420, 428, 669 N.E.2d 9, citing *Hubach v. Cole* (1938), 133 Ohio St. 137, 10 O.O. 187, 12 N.E.2d 283.

{¶ 38} A directed verdict is appropriate where the party opposing it has failed to adduce *any evidence* on the essential elements of his claim. *Glover v. Boehm Pressed Steel Co.* (1997), 122 Ohio App.3d 702, 709, 702 N.E.2d 929. But "a motion for a directed verdict must be denied when 'substantial, competent evidence has been presented from which reasonable minds could draw different conclusions.'" *Waddell v. Roxane Laboratories,* Franklin App. No. 03AP–558,

2004-Ohio-2499, 2004 WL 1103710, ¶ 34, quoting *Kroh v. Continental Gen. Tire, Inc.* (2001), 92 Ohio St.3d 30, 31, 748 N.E.2d 36. In this case, Dubois's testimony constituted sufficient evidence that the FM22 had a quench crack and that it was this quench crack that caused the claw to break off. Accordingly, reasonable minds could have differed on the issue whether the FM22 contained a manufacturing defect.

{¶ 39} Additionally, appellant argues that appellee failed to establish proximate cause for purposes of the negligence claim. It argues that appellee's use of the hammer to strike masonry nails and the fact that another of appellee's hammers was severely flattened and had a crack showed that it was appellee's abuse of the FM22—not defective manufacturing—that caused it to break. Moreover, it argues, appellee's unforeseeable misuse of the FM22 is a complete defense to the strict product liability claim. Thus, appellant argues, appellee's misuse of the FM22 independently merited a directed verdict in its favor as to both the product-liability claim and the negligence claim.[5]

{¶ 40} In any product-liability case, whether based in common law or statute, a plaintiff must prove that the product defect proximately caused his injury. *State Farm Fire & Cas. Co. v. Chrysler Corp.* (1988), 37 Ohio St.3d 1, 523 N.E.2d 489; *Jeffers,* 43 Ohio St.3d 140, 539 N.E.2d 614; R.C. 2307.73(A)(2). "The rule of proximate cause 'requires that the injury sustained shall be the natural and probable consequence of the negligence alleged; that is, such consequence as under the surrounding circumstances of the particular case might, and should have been foreseen or anticipated by the wrongdoer as likely to follow his negligent act.' " *Jeffers* at 143, 539 N.E.2d 614, quoting *Ross v. Nutt* (1964), 177 Ohio St. 113, 114, 29 O.O.2d 313, 203 N.E.2d 118. Accordingly, "an otherwise strictly liable defendant has a complete defense if * * * the plaintiff misused the product in an unforeseeable manner." *Bowling v. Heil Co.* (1987), 31 Ohio St.3d 277, 282, 31 OBR 559, 511 N.E.2d 373. Congruently, " '[i]f an injury is the natural and probable consequence of a negligent act and it is such as should have been foreseen in the light of all the attending circumstances, the injury is then the proximate result of the negligence.' " *Mussivand v. David* (1989), 45 Ohio St.3d 314, 321, 544 N.E.2d 265, quoting *Mudrich v. Std. Oil Co.* (1950), 153 Ohio St. 31, 39, 41 O.O. 117, 90 N.E.2d 859.

{¶ 41} "[A] defendant's conduct is a cause of the event (or harm) if the event (or harm) would not have occurred *but for* that conduct; conversely, the defendant's conduct is not the cause of the event (or harm) if the event (or harm) would

---

5. Appellant requested and received a jury instruction on its unforeseeable-misuse defense. The jury answered an interrogatory in which it unanimously concluded that appellee did not unforeseeably misuse the FM22.

have occurred regardless of the conduct. Prosser & Keeton, Law of Torts (5 Ed.1984) 266." (Emphasis sic.) *Anderson v. St. Francis–St. George Hosp., Inc.* (1996), 77 Ohio St.3d 82, 84–85, 671 N.E.2d 225. " '[L]egal responsibility must be limited to those causes which are so closely connected with the result and of such significance that the law is justified in imposing liability.' " *Johnson v. Univ. Hosp. of Cleveland* (1989), 44 Ohio St.3d 49, 57, 540 N.E.2d 1370, quoting Prosser & Keeton, Law of Torts (5th Ed.1984) 264, Section 41.

{¶ 42} Ordinarily, proximate cause is a question of fact for the jury. See *Strother v. Hutchinson* (1981), 67 Ohio St.2d 282, 288, 21 O.O.3d 177, 423 N.E.2d 467, citing *Clinger v. Duncan* (1957), 166 Ohio St. 216, 2 O.O.2d 31, 141 N.E.2d 156.

{¶ 43} Judgment as a matter of law is appropriate only "where the product is used in a capacity which is unforeseeable by the manufacturer and completely incompatible with the product's design." *Cox v. Oliver Mach. Co.* (1987), 41 Ohio App.3d 28, 31, 534 N.E.2d 855. " 'Misuse' of a product suggests a use which was unanticipated or unexpected by the product manufacturer, or unforeseeable and unanticipated." *Markus v. SICO, Inc.* (May 13, 1999), Cuyahoga App. No. 74060, 1999 WL 304520. In our view, the court properly sent this issue to the jury, as it was not the case that reasonable minds could only conclude that appellee misused the FM22. Though appellee's use of the hammer might have been *unreasonable,* unreasonable use is not a defense to a strict product-liability action or to a negligence action. *Bowling,* 31 Ohio St.3d at 282, 31 OBR 559, 511 N.E.2d 373; *Calmes v. Goodyear Tire & Rubber Co.* (1991), 61 Ohio St.3d 470, 476, 575 N.E.2d 416.

{¶ 44} Finally, appellant argues that it was entitled to a directed verdict on its strict product-liability claim because when appellee failed to wear goggles while using the FM22, he knowingly and voluntarily assumed the risk occasioned by any defect. *Bowling,* 31 Ohio St.3d at 282, 31 OBR 559, 511 N.E.2d 373. For support of this proposition, appellant points out that appellee admitted that he knew that it is safer to wear goggles when using the hammer because he was aware of the risk that tools can chip and come apart.

{¶ 45} "For the defense of assumption of the risk to act as a bar to recovery of damages, the defendant must establish that the plaintiff knew of the condition, that the condition was patently dangerous, and that the plaintiff voluntarily exposed himself or herself to the condition. Ordinarily, assumption of the risk is a question of fact, to be resolved by the factfinder." *Carrel v. Allied Prods. Corp.* (1997), 78 Ohio St.3d 284, 289, 677 N.E.2d 795, citing *Goodin v. Corry* (1982), 5 Ohio App.3d 178, 5 OBR 362, 450 N.E.2d 727; *Sapp v. Stoney Ridge Truck Tire* (1993), 86 Ohio App.3d 85, 97, 619 N.E.2d 1172.

{¶ 46} Appellee argues that appellant was not entitled to judgment as a matter of law based on assumption of the risk because there was no evidence that appellee knew of the existence of the defect (i.e., the quench crack). Appellee maintains that the defense will not apply where the plaintiff was merely aware that use of the product carries some risks; rather, the defendant must show that the plaintiff was aware of the actual condition or defect alleged to have caused the injuries.

{¶ 47} By finding appellee 35 percent negligent, the jury determined that appellee failed to guard against the possibility of a defect when he decided not to wear his goggles. But comparative negligence does not apply to strict product liability. *Bowling*, 31 Ohio St.3d at 283, 31 OBR 559, 511 N.E.2d 373. Thus, in order to be relieved of all liability for appellee's product-liability claim, the evidence had to show that "[appellee] knew of the condition, that the condition was patently dangerous, and that [appellee] voluntarily exposed himself * * * to the condition." *Carrel*, 78 Ohio St.3d at 289, 677 N.E.2d 795. However, there is no evidence in the record to demonstrate that appellee was aware of the quench crack in his FM22. Thus, appellant was not entitled to a directed verdict on its affirmative defense of assumption of the risk.

{¶ 48} For all of the foregoing reasons, the trial court did not err in denying appellant's motion for directed verdict as to the strict-product-liability and negligence claims. Therefore, appellant's third assignment of error is overruled.

{¶ 49} In its fourth assignment of error, appellant argues that the trial court erred in instructing the jury in two respects: (1) by refusing to give the jury an instruction on the doctrine of assumption of the risk and (2) by refusing to give a so-called "sophisticated user" instruction. We review a trial court's refusal to give a jury instruction for an abuse of discretion. *Dawson v. McNeal*, Franklin App. No. 03AP–396, 2004-Ohio-107, 2004 WL 51786, ¶ 17; *Peck v. Serio*, 155 Ohio App.3d 471, 2003-Ohio-6561, 801 N.E.2d 890, ¶ 6. "Generally, a trial court should give a requested instruction if it is a correct statement of the law applicable to the facts in the case and reasonable minds might reach the conclusion sought by the instruction." *Miller v. Lindsay–Green*, Franklin App. No. 04AP–848, 2005-Ohio-6366, 2005 WL 3220215, ¶ 91, citing *Murphy v. Carrollton Mfg. Co.* (1991), 61 Ohio St.3d 585, 591, 575 N.E.2d 828.

{¶ 50} With respect to the defense of assumption of the risk, as we explained above, there was no evidence adduced upon which reasonable minds could differ as to whether appellee was aware of the defect in the FM22. Therefore, it was not an abuse of discretion for the trial court to refuse to give the assumption-of-the-risk instruction. With respect to the "sophisticated user" instruction, appellant argued below, and argues here, that by virtue of appellee's

ten years of experience as a framing carpenter, he is a "sophisticated user" of hammers, and his status as a sophisticated user means that he must be deemed to have been aware of the specific risk that the FM22 posed.

{¶ 51} Appellant provides no citation to any authority for this argument, and we are unaware of any such authority. Our research reveals that only one Ohio court has ever mentioned the "sophisticated user" doctrine, and that court described it thusly: "The sophisticated or knowledgeable purchaser defense is invoked in cases involving suppliers of dangerous products to industrial companies." *Roberts v. George V. Hamilton, Inc.* (June 30, 2000), Jefferson App. No. 99 JE 26, 2000 WL 875324. *Roberts* involved a claim against a manufacturer of asbestos-containing insulation brought by the widow of a man who had formerly been employed by an industrial company that used the insulation, and the plaintiff alleged that the manufacturer had failed to warn her deceased husband's employer about the risks associated with the insulation. In that case, the "sophisticated user" was the employer, not the plaintiff's decedent. No Ohio court has ever applied the "sophisticated user" doctrine to a non-failure-to-warn claim, and appellant has cited no authority for the proposition that we should do so. We find no abuse of discretion in the trial court's refusal to instruct the jury that, as a matter of law, appellee's experience as a carpenter warrants that he be deemed aware of the risk of a quench crack in his hammer. For the foregoing reasons, appellant's fourth assignment of error is overruled.

{¶ 52} In its fifth assignment of error, appellant argues that the trial court erred in refusing to allow it to cross-examine Dubois about the ASME safety standard for nail hammers. "The admission of evidence is generally within the sound discretion of the trial court, and a reviewing court may reverse only upon the showing of an abuse of that discretion." *Peters v. Ohio State Lottery Comm.* (1992), 63 Ohio St.3d 296, 299, 587 N.E.2d 290.

{¶ 53} Appellant argues that the court's refusal to admit evidence of the ASME safety standard was prejudicial because the standard, which states, "nail hammers shall not be used to strike * * * masonry nails" demonstrates that appellee's use of the FM22 in that manner was not reasonably foreseeable to appellant. But as appellee points out, this argument would have misled the jury into believing that because appellant relied on the ASME standard for determining which uses it could reasonably foresee, appellee's conduct while using the hammer must have been governed by the ASME standard. Appellant does not argue, and we see no evidence, that the ASME standard is binding upon users such as appellee. Accordingly, it was not an abuse of discretion for the court to refuse to admit this evidence. For this reason, appellant's fifth assignment of error is overruled.

{¶ 54} In its sixth assignment of error, appellant argues that the trial court erred in denying its motion for remittitur. Specifically, it argues that the court should have remitted the compensatory-damage award in the amount of future economic damages that the jury awarded. In light of our resolution of appellant's first assignment of error, in which we determined that appellant was entitled to a JNOV as a matter of law because the jury's award of future economic damages was unsupported by the evidence, appellant's sixth assignment of error is moot, and we overrule it on that basis.

{¶ 55} In its seventh assignment of error, appellant argues that the trial court erred in denying its motion for new trial. It argues, as it did before the trial court, that it is entitled to a new trial: (1) pursuant to Civ.R. 59(A)(1), because the cumulative effect of the many errors below deprived it of a fair trial; (2) pursuant to Civ.R. 59(A)(6), because the jury's award of future economic damages was against the manifest weight of the evidence; and (3) pursuant to Civ.R. 59(A)(9), because the trial court made an error of law in admitting the testimony of Drs. Palfin and Growick.

{¶ 56} In our resolution of appellant's first assignment of error, we concluded that the jury's award of future economic damages was indeed unsupported by sufficient evidence, and therefore, the trial court erred in denying appellant's motion for JNOV; this renders moot the second argument under appellant's seventh assignment of error. Our resolution of appellant's first assignment of error also rendered moot appellant's assignment of error concerning the admission of the testimony of Drs. Palfin and Growick. Accordingly, appellant's third argument under its seventh assignment of error is moot because it concerns the same issue. Finally, we have recognized only one error that prejudicially affected appellant during the proceedings below, and we have fully corrected it by sustaining appellant's first assignment of error. Thus, we do not discern a cumulative prejudice to appellant's defense that would warrant a new trial. For all of the foregoing reasons, appellant's seventh assignment of error is overruled.

{¶ 57} In summary, we sustain appellant's first assignment of error, and we overrule appellant's second, third, fourth, fifth, sixth, and seventh assignments of error. We affirm in part and reverse in part the judgment of the Franklin County Court of Common Pleas, and we remand this matter to that court for further proceedings consistent with this opinion.

Judgment affirmed in part
and reversed in part,
and cause remanded.

McGRATH, J., concurs.

BROWN, J., concurs in part and dissents in part.

BROWN, Judge, concurring in part and dissenting in part.

{¶ 58} The majority finds that the trial court erred in submitting the issue of lost earning capacity to the jury, thereby holding that appellee is entitled to no compensation for future lost earning capacity. The basis for this finding appears to be that appellee has been able to return to work for his former employer at a higher wage and because the vocational expert could consider only certain factors such as accommodations made by his employer, but could not definitively say whether appellee could continue to be employed as a framing contractor. While appellee's current ability to earn wages does reduce any past lost wages, his impaired future earning claim is a matter that should be decided based upon the opinion of experts.

{¶ 59} Appellee presented substantial, competent evidence through expert testimony that it was reasonably certain appellee would experience a loss of future earning capacity. The earning capacity of appellee is not necessarily dependent upon what is actually earned before or after the injury. Earning capacity is what appellee was capable of earning prior to the injury compared with what he is capable of earning in the future. The lost earning capacity of appellee was addressed by both the vocational expert and the economic expert for appellee.

{¶ 60} The testimony of both experts was necessary in this case to establish appellee's diminished future earning capacity. The trial court's judgment is based upon both experts' opinions as to what impairment appellee will suffer in the future. Appellee questioned the physician to establish the disability, the vocational expert to discuss its effect in the workplace, and the economist to calculate its value.

{¶ 61} The majority relies upon answers to questions posed to Dr. Growick as a basis for finding that there was a failure to prove future lost earning capacity. The vocational expert was asked the following questions on cross-examination:

Q. You don't have any idea whatsoever, sir, within any reasonable degree of certainty, as to whether he is not going to be able to be employed as a framing carpenter, do you?

A. No.

Q. It would be totally speculative that he would not be able to do his job at some point, right?

A. Correct. I couldn't predict the future other than if he has good personnel reviews currently, and the industry is doing well, and his employer is doing well, which sometimes the accommodations like his is employer specific. Given those considerations, other than that, I can't predict what would happen.

{¶ 62} This testimony did not affect appellee's ability to prove lost earning capacity, as that element of damage has been accepted under Ohio law. The mere fact that appellee can still do his job today and the mere fact that his employer is accommodating him and may continue to accommodate him does not preclude a claim for lost earning capacity. At trial, Dr. Palfin gave an example of lost earning capacity when he testified:

> A. The reality in economics is capacity income of an individual. For example, if you have a physician who is earning [$]400,000 a year, decides to start a winery up in Napa, California, loses money a year and is injured, what is his loss?
>
> It's not the loss as a proprietor of a winery in Napa. It's the loss of what his capacity is as a physician, what he could have done, not necessarily what he would have done.

The fact that no one can predict whether appellee's employer will continue to accommodate him does not preclude a finding of lost earning capacity.

{¶ 63} Appellee will suffer obvious deficits for the rest of his working life. Dr. Growick testified that with his depth-perception problem and monocular vision, appellee would be excluded from a significant portion of jobs he would be capable of doing. Appellee testified that he sometimes runs into things and he is slower. His current employer will not let him operate the forklift. His employer does not want him to work on the second floor of any house or walk the walls and lay them out for joists. The trial court properly submitted this issue to the jury, and the jury properly concluded that these restrictions would put appellee at an economic disadvantage in the future. The jury's verdict was reasonable, based upon expert testimony, that appellee will be more likely to be laid off in economic downturns and less likely to be hired for jobs in the future.

{¶ 64} The majority finds, after construing the evidence most strongly in favor of appellee, that appellee failed to prove with reasonable certainty his claim for future lost earning capacity. In reaching its conclusion, the majority cited portions of Dr. Growick's testimony, ignoring the rest and failing to consider the testimony of Dr. Palfin. At trial, Dr. Growick testified to the following regarding appellee:

> [H]e scored average, which was consistent with what his vocational profile is. Although, interestingly enough, he had a relatively low verbal IQ, which might be consistent with the fact that he dropped out of high school. * * * * * *
>
> * * * [H]e will be excluded from a significant portion of the available jobs that he is capable of doing.
>
> * * *

\* \* \* [T]he kinds of jobs he would be able to do, if he did become unemployed, certainly are not as broad as what he could have done prior to the accident. I would say it would be about 15 or 20 percent of the available unskilled jobs that he could do.

And given the economy and everything else, you have to assume that he is going to have a tougher time with monocular vision, with low education, basically unskilled and low semi-skilled work experience.

{¶ 65} Dr. Growick testified that because appellee's current employer was making accommodations for him, he "might not be likely to get a similar job somewhere else." Dr. Growick agreed with counsel that appellee's employment prospects in the future are bleak. Dr Growick, on cross-examination, testified that "the kinds of jobs I would see [appellee] sort of gravitating to would be work order clerk. Somebody that is going to handle the manifest at a docking station when it comes in, things like that." Dr. Growick also testified that the skills necessary to be a carpenter require depth perception and field of vision according to definitions of occupational titles produced by the government.

{¶ 66} This testimony established that at least in Dr. Growick's opinion, appellee does have restrictions that will limit his capacity to earn income as a carpenter over the next 30 years. The next issue then to be addressed is whether the evidence in the record establishes that these restrictions result in reduced earning capacity as compared to appellee's preinjury earning capacity. The majority indicates that a jury should not be able to speculate as to the value attached to the postinjury earning capacity. However, Dr. Growick gave testimony as to the earning capacity of the type of job that appellee would be capable of performing. This testimony was set forth during the cross-examination of Dr. Growick when he testified that the kind of job appellee could perform, such as store clerk, would have the capacity to earn "[e]ight to ten dollars an hour, generally speaking." It is probable that the jurors accepted the differential in earning capacity of eight to ten dollars per hour compared to the $14–per–hour capacity established by Dr. Palfin for a carpenter in reaching their verdict. The earning capacity difference of up to six dollars for 2,080 hours per year times 30 years equals $374,400 which is fairly close to the $417,000 in lost earning capacity found by the jury.

{¶ 67} Dr. Palfin, an expert witness for appellee, has over 40 years of experience as an economist. He has served as a bank examiner for the FDIC, a contracting officer and economist for the United States Department of Defense, and as a professor. Dr. Palfin was called to provide his opinion to quantify and calculate the actual lost earning capacity of appellee. Dr. Palfin relied in part on the following information from the testimony of Dr. Growick: (1) appellee is not necessarily a good candidate for further retraining without substantial education,

(2) he is blind in one eye and will not improve, (3) 85 percent of all unskilled jobs require some depth perception, and (4) appellee is excluded from a significant portion of the labor market.

{¶ 68} Dr. Palfin testified that his calculation of lost future earning capacity was based on $14 per hour through retirement at age 65. Dr. Palfin further testified that his opinion was based upon a reasonable degree of economic certainty. On cross-examination, appellant challenged Dr. Palfin as to whether the lost earning capacity of appellee was speculative. Dr. Palfin testified: "It is not speculative. Think of the example I gave you, the physician versus the wine venture. That's not speculative. Capacity is what counts." Again, on cross-examination, Dr. Palfin testified: "Again, capacity is what you could do, not what you would do or did do. Capacity, that's the key concept."

{¶ 69} There was evidence from the expert witnesses that established that the loss of vision in one eye resulted in a loss of earning capacity. The experts testified that the loss of one eye severely limited appellee's occupational choices and, at least according to Dr. Growick, disqualifies him from his chosen field of carpentry. Dr. Growick provided testimony from which the jury could conclude that the earning capacity post-injury would be in the range of eight to ten dollars per hour. Dr. Palfin established that the earning capacity preinjury would be $14 per hour.

{¶ 70} The majority acknowledges that appellee's return to his former position does not necessarily preclude his recovery of future economic damages, but finds that appellee did not sustain his burden of proof because the experts' opinions as to his lost earning capacity were fundamentally flawed. I respectfully disagree. The trial court, in its decision denying appellant's motion for judgment notwithstanding the verdict, found that "the testimony, if believed by the jury, was that the incident in question caused plaintiff to permanently lose the sight in one of his eyes and that as a consequence of this condition, his employability potentialities and prospects in the future have suffered, all to his future economic detriment." Accordingly, the trial court found appellee had presented sufficient evidence to support the jury's award of future economic damages. Based upon an independent, de novo review of the record, I similarly conclude that reasonable minds could differ as to appellee's entitlement to future economic damages, and, thus, I would overrule appellant's first assignment of error. Being in the minority, I find it unnecessary to address the issues raised under the second, sixth, and seventh assignments of error. I concur, however, with the majority's analysis of the remaining assignments of error.