**MARTIN, Appellee and Cross–Appellant,**

v.

**CSX TRANSPORTATION, INC., Appellant and Cross–Appellee.**

[Cite as *Martin v. CSX Transp., Inc.,* 185 Ohio App.3d 1, 2009-Ohio-6054.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 08AP–846.

Decided Nov. 17, 2009.

4

Sams & Hollon, P.A. and Alva A. Hollon Jr.; The Gallagher Law Firm and Russell Serafin; and Landskroner Grieco Madden, Ltd., and Justin F. Madden, for appellee and cross-appellant.

Porter Wright Morris & Arthur, L.L.P., Craig R. Carlson, R. Leland Evans, and Megan E. Bailey, for appellant and cross-appellee.

---

SADLER, Judge.

{¶ 1} Appellant and cross-appellee, CSX Transportation, Inc. ("CSX"), filed this appeal seeking reversal of a judgment by the Franklin County Court of Common Pleas in favor of appellee and cross-appellant, Timothy W. Martin. Martin filed a cross-appeal. For the reasons that follow, we affirm in part and reverse in part.

{¶ 2} On October 15, 2002, Martin was 37 years old and was employed by CSX as a signal maintainer, a job that involved checking and repairing signals and switches along the railroad tracks. On that date, Martin and senior signal maintainer Tim Stamper were directed by their supervisor, Chris Clark, to check a broken pole along the tracks between Sciotoville and Minford, Ohio, and to determine whether the pole could be removed. Martin had never removed a pole before, but had removed tree branches.

{¶ 3} Martin and Stamper checked the broken pole and decided to attempt to remove it. Stamper used a pole stick to steady the broken pole while Martin used a chainsaw to cut pieces from the bottom of the pole. After Martin made the first cut, the pole, which was still attached to the wires running along the track, flipped over and struck Martin's helmet. A bolt used to attach a crossarm to the pole pierced Martin's shoulder.

{¶ 4} Martin did not want to file an injury report, so Stamper drove Martin to Stamper's home, where Stamper's wife administered first aid. Three CSX employees, including Martin's supervisor, went to Stamper's home and asked Martin whether he wanted to file an accident report. Martin declined because he was concerned that filing an accident report could have repercussions for his job. Later that day, Martin drove himself to an urgent-care center to have the shoulder wound checked and to get a tetanus shot.

{¶ 5} Martin returned to work the following day and continued to work for CSX until June 2003, when he underwent surgery for an unrelated medical condition. Martin did not return to work after that surgery.

{¶ 6} Martin filed an action seeking recovery for his injuries pursuant to the Federal Employers Liability Act ("FELA") in a Florida court. After CSX filed a motion to dismiss based on the doctrine of forum non conveniens, Martin agreed to dismiss the action and refile the case in Ohio. Martin filed his action in the Franklin County Court of Common Pleas, alleging (1) negligence for failing to use reasonable care and for failing to provide a safe place to work, (2) negligence for failing to provide Martin with suitable equipment to perform work safely, (3) negligence for failing to provide sufficient manpower to perform work safely, (4) negligence for assigning Martin work for which he was not qualified, (5) negligence for assigning Martin work beyond his physical capabilities, and (6) failure of CSX to comply with FELA.

{¶ 7} Ultimately, the case proceeded to a jury trial before a magistrate. The jury found in favor of Martin and awarded damages in the amount of $2,029,941. The jury further found that Martin was 30 percent contributorily negligent. Thus, the total amount of the judgment in Martin's favor was $1,420,958.70. The trial court overruled a motion by CSX seeking a setoff against the jury verdict and motions by Martin seeking to overturn the jury's finding on contributory negligence.

{¶ 8} CSX filed an appeal, alleging six assignments of error:

[1.] The trial court erred in its August 28, 2008 final judgment and entry and its October 7, 2008 final judgment and entry.

[2.] The trial court erred in denying Defendant's partial motion for directed verdict regarding future damages.

[3.] The trial court erroneously excluded testimony as inadmissible hearsay.

[4.] The trial court erred by excluding evidence of Plaintiff's receipt of various disability benefits as inadmissible collateral source evidence.

[5.] The trial court erred in rejecting Defendant's proposed jury instructions regarding causation and in failing to properly instruct the jury as to the correct standard of causation under the Federal Employers Liability Act.

[6.] The trial court erred in denying the Defendant's motion for summary judgment.

{¶ 9} Martin filed a cross-appeal, alleging two assignments of error:

[1.] The trial court erred in failing to direct a verdict based upon Cross–Appellant's lack of contributory negligence.

[2.] The trial court erred in overruling Cross–Appellant's post-trial Motion for Judgment Notwithstanding the Verdict.

{¶ 10} Although designated as a separate assignment of error, CSX's brief does not contain any argument regarding any alleged error in the trial court's

**6**

final judgment entry. Consequently, we need not address that assignment of error. App.R. 12(A)(2). CSX's first assignment of error is therefore overruled.

{¶ 11} In its second assignment of error, CSX argues that it should have been granted a partial directed verdict on the issue of future damages. CSX argues that none of the medical testimony Martin offered included any conclusion that the injuries Martin suffered were permanent in nature, and the issue of future damages should therefore not have been submitted to the jury for consideration. The jury's verdict included as one element of the damages a total of $950,000 for future wage loss.

{¶ 12} Civ.R. 50(A)(4) provides that "[w]hen a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue."

{¶ 13} " '[I]t is well established that the court must neither consider the weight of the evidence nor the credibility of the witnesses in disposing of a directed verdict motion. * * * Thus, "if there is substantial competent evidence to support the party against whom the motion is made, upon which evidence reasonable minds might reach different conclusions, the motion must be denied." ' " (Citations omitted.) *Eastman v. Stanley Works*, 180 Ohio App.3d 844, 2009-Ohio-634, 907 N.E.2d 768, ¶ 18, quoting *Estate of Cowling v. Estate of Cowling*, 109 Ohio St.3d 276, 2006-Ohio-2418, 847 N.E.2d 405, ¶ 31, quoting *Strother v. Hutchinson* (1981), 67 Ohio St.2d 282, 284–285, 21 O.O.3d 177, 423 N.E.2d 467.

{¶ 14} CSX argues that the evidence was insufficient for Martin to carry his burden of proving that the October 15, 2002 incident resulted in future wage loss. In order to show future wage loss in a personal-injury case, a plaintiff must demonstrate with reasonable certainty that the plaintiff's injury prevents the plaintiff from attaining his pre-injury wage. *Hall v. Kreider Mfg., Inc.*, 10th Dist. No. 03AP–272, 2003-Ohio-6661, 2003 WL 22927416. If the injury itself, independent of other factors, provides an evidentiary basis for a jury to conclude with reasonable certainty that future damages will result, no expert testimony regarding permanent impairment is necessary. Id., citing *Ratliff v. Colasurd* (Apr. 27, 1999), 10th Dist. No. 98AP–504, 1999 WL 253002. However, where an injury is subjective in nature, expert testimony is required to establish both that the injury is permanent in nature and that the injury is certain to have an adverse effect on future earning capacity. *Hall.* In FELA cases, courts

considering the appropriateness of an award for future wage loss have considered whether expert testimony that a plaintiff's injuries are permanent has been provided. *Martinez v. Union Pacific RR. Co.* (C.A.8, 1996), 82 F.3d 223.

{¶ 15} Martin provided testimony from a number of witnesses regarding the nature of his injuries. Dr. William Zerick is a neurological surgeon who performed three surgeries on Martin's neck. Dr. Zerick testified in a video deposition that the first surgery, on April 5, 2004, was for the purpose of removing a disk from Martin's neck, between the fifth and sixth cervical vertebrae, that was placing pressure on a nerve, and included placement of a titanium plate and screws. The second surgery, on May 11, 2005, was in response to complaints of constant headaches and involved removal of another disk, between the sixth and seventh cervical vertebrae, and placement of another titanium plate and screws. The third surgery, on February 27, 2006, involved complaints of severe arm pain and involved the same area as the first surgery.

{¶ 16} When asked whether each of the surgeries was related to the October 15, 2002 incident, Dr. Zerick stated:

A. You know, I felt—and again—you know, my—my understanding from the conversations we had was that before a pole fell on him, he really didn't have any significant complaints of neck, arm pain and that all began after this pole fell on him, so I think it's reasonable to say that the first surgery was brought about by the accident.

The second surgery is less clear. You know, one would—one could argue that in 2003 an MRI showed that he did not have significant disc protrusion at C6–7, but then in 2005 he did resulting in a second surgery.

So you could say, well, you know, that's just life, that's just nature, and that is what we typically see.

You could also argue that—and I don't know what the answer is. You could also argue that, gosh, he had surgery at C5–6 that I would—I'm—I am convinced was caused by his accident and that predisposed him to need the subsequent adjacent level surgery and, you know, we know that that is a real entity.

The third surgery, when I saw him that day and to this day, I don't really understand that. And I would say that the third surgery was either because I didn't do an adequate job of decompressing his C5–6 nerve at the time of his first surgery, or, B, he, for whatever reason, developed a recurrent bone spur at that level. I don't know. I don't know. But, you know, I—that in no way is related to his accident.

{¶ 17} As to the question of whether Martin's injuries are permanent, Dr. Zerick testified:

Q. Doctor, has Mr. Martin, as far as the neck is concerned, reached what you call maximum medical improvement?

A. Yes.

Q. And for—and in layman's terms, what does maximum medical improvement or MMI mean to a doctor?

A. That at this point there's—you know, there's—he's at some sort of plateau. There's nothing really for us to do to—you know, he's probably as good as he's going to get with respect to his neck issues.

Q. Doctor, I'm going to ask you some questions for your opinion. I'd like for you to express your opinion in terms of a reasonable and medical probability based upon your training and experience as a neurosurgeon, your examination and treatment and sub—and subsequent surgery of Mr. Martin. What would be your final diagnosis as far as his neck? In other words, what's his—what's the present condition of his neck?

A. He has, you know, cervical spondylosis, which is really just a fancy term for, you know, arthritic changes. He has a fuse—he is fused from C5 to C6 to C7.

Q. And that would be about—and—and I guess in centimeters or inches, about what—what portion of the neck are we talking about in that fusion?

A. It's about a third of his neck. It's probably about two and a half inches.

Q. And with the fusion of the neck, Doctor, what does that—what does that do to the neck, a person's ability to move that portion that's fused?

A. I mean, it's variable in different people. I mean, a lot of people—you know, certainly as you age, it's normal as you age to lose some element of movement of your neck as your joints become more arthritic. That's just normal aging.

But people that have undergone a one-level fusion, such as Mr. Martin did early on, some of those people can tell a difference, some can't.

The majority of the people that have a two-level fusion, such as Mr. Martin at this p[o]int, most of those people can tell a difference with their cervical range of motion both in the up and down and side to side motion, so—

Q. Doctor, this particular condition for which you have operated on Mr. Martin's neck, is that a permanent condition? In other words, is the hardware—the hardware, is it in there to stay?

A. Well, the hardware is superfluous. Once—the hardware is intended to stabilize the spine until bone fusion, the biological process of bone fusion, can occur, and that has occurred with him.

So at this point, if we could magically, you know, remove the hardware, that—that's fine. It's not doing anything at this point.

Q. The range of motion limitations which you told us about, are those permanent restrictions as far as his range of motion of his neck is concerned?

A. Yes.

Q. Doctor, Mr. Martin has—has advised you, I take it, that he worked on the railroad. In fact, he was working on the railroad when he got hurt in October 2002. Is that what you recall?

A. I believe so, yes, sir.

Q. Would—would he be able—based on what he's told you, and I know you don't have all your charts, I mean don't have all the—maybe not all the details, but based on what he's told you, would you—would he be allowed or would it be recommended that he go back to work for the railroad or discontinue that?

A. Well, you know, it's a difficult question. And my feeling is I always want people to go back to work. I mean, I think working's important. And—and I always try to get people to go back—at least try to go back to work, you know, try to rehab them, whatever, go back to work and see if they can do it. I mean, it's a very subjective thing.

With Mr. Martin, my feeling based upon—I don't really remember the conversation, although I know we had it, I basically—you know, after we talked, you know, it's very subjective. I mean, it's up—you know, I have to—I—they know how they feel. They know what they do.

My feeling, if you assimilate everything, my feeling is that it's unlikely that he could return to that type of work, I mean a very heavy laborious type of work.

[Q.] Is that—and that's based on the—the injury to his neck and his subsequent surgery?

[A.] Well, not just that. I think—you know, I think—I'm sure not a shoulder specialist, but, I mean, I think he has the shoulder problem. He's had, you know, three neck surgeries.

Not to say that people with three neck surgeries don't go back to work, but I don't * * * again, it's very subjective, but I think it's unlikely that he could—it's probably not the safest thing.

And the next guy that goes through more than Tim might be able to go back to work and do fine. And some of it's based on, you know, him telling me things.

But I think that if I had to advise, I would say I would probably tell him, and I did, I told him he should seek disability.

And I don't like people on disability. I mean, I'd rather people try to work, but I think the right thing in this situation was to advise him not to return to work, to that type of work.

Q. So, in other words, correct me if I'm wrong, it would be your recommendation that he not return to the same kind of job he was doing for the railroad?

A. Yes, that's correct.

Q. Doctor, what is Mr. Martin's prognosis as far as his neck's concerned?

A. I don't know. I mean, he may never have another problem. He may never have another surgical procedure. I mean, you know—I mean, certainly the guy is a—he's still—you know—I mean, he may have another surgery. He may have another surgery. I can't tell you.

{¶ 18} Martin also offered the deposition testimony of Dr. Yousef Mohammad. Dr. Mohammad gave his opinion that Martin suffered postconcussion syndrome as a result of the October 15, 2002 incident and that this condition could interfere with his ability to work. However, Dr. Mohammad was not asked whether this condition is permanent.

{¶ 19} Dr. Kimberly Umhoefer, Martin's family physician, also testified on his behalf by way of deposition. During the reading of Dr. Umhoefer's deposition, there was a sidebar discussion regarding Dr. Umhoefer's opinion regarding the permanence of Martin's injuries. During the sidebar, counsel indicated that when asked about permanence, Dr. Umhoefer stated that it was too early to tell whether the injuries are permanent. As a result of this discussion, Dr. Umhoefer's opinion on permanence was excluded from the reading of the deposition. Therefore, the jury did not hear Dr. Umhoefer's opinion on this subject.

{¶ 20} The only other medical evidence offered regarding the nature of Martin's injuries was that of Dr. Joseph Carver, a clinical psychologist. Dr. Carver gave his opinion that Martin suffers from depression at a major or severe level, and that this depression prevents Martin from gainful employment. However, Dr. Carver was not asked whether Martin's major depression is a permanent condition.

{¶ 21} The testimony offered showed that Martin's injuries are subjective, not objective in nature. Thus, Martin was required to offer expert testimony both that the injuries he suffered on October 15, 2002, are permanent and that those injuries are certain to result in future loss of earning capacity. *Hall*, 2003-Ohio-6661, 2003 WL 22927416.

{¶ 22} The only medical testimony on the issue of permanency was that of Dr. Zerick, who stated that the loss of range of motion in Martin's neck is permanent. However, Dr. Zerick's opinion did not differentiate between the loss of range of motion resulting from the first surgery, which he stated was related to the October 15, 2002 incident, and the loss of range resulting from the second surgery, which he could not sufficiently relate to the incident. Instead, Dr. Zerick stated that some people who have undergone a single fusion, such as that accomplished by the first surgery, can tell a difference in their range of motion, and some cannot tell a difference, whereas "most" people undergoing a double

fusion, such as that resulting from the second surgery, can tell that some range of motion has been lost. During argument on CSX's motion for directed verdict, Martin's attorney argued that the permanency of Martin's injuries could be inferred from the testimony that Martin would permanently have the plate and screws from the fusion surgery in his neck. However, this argument was directly refuted by Dr. Zerick's testimony in response to questioning by Martin's counsel that those items were serving no purpose. No other medical testimony established that the injuries suffered as a result of the October 15, 2002 incident, including Martin's major depression, are permanent conditions.

{¶ 23} Ultimately, based on our review of the record, we believe the evidence on the issue of whether Martin's injuries are permanent in nature was not sufficient to support an instruction to the jury on future wage loss. The evidence was clear that Martin cannot return to his former employment as a signal maintainer, but the evidence was insufficient to support a claim that he is permanently prevented from working. Arguably, the fact that the jury was given an instruction on mitigation of damages directing that they consider the availability of other employment allowed the jury to consider this possibility in determining an award. However, given the lack of any testimony from the medical experts that Martin's injuries resulting from the October 15, 2002 incident are permanent, we find that the issue of future wage loss should not have been submitted to the jury at all and that CSX was entitled to a directed verdict on that issue.

{¶ 24} Accordingly, CSX's second assignment of error is sustained.

{¶ 25} In its third assignment of error, CSX argues that the trial court erred when it excluded as inadmissible hearsay a statement made by Martin's former supervisor, Chris Clark. During the testimony of Oval Osborne, a CSX employee who had checked the pole in question prior to Martin's attempt to remove it, Osborne testified that he believed it would be necessary to remove the pole using a boom truck, which is a truck equipped with a movable arm that can be used to lift heavy objects, and that he communicated this belief to Clark. CSX attempted, through Osborne, to introduce a statement made by Clark that Clark believed a boom truck could not be used because the precise location of the pole would make it impossible for the boom to reach it. Martin objected to introduction of the statement on hearsay grounds. The trial court sustained the objection and excluded the testimony.

{¶ 26} The decision to admit or exclude evidence lies within the broad discretion of the trial court, and a reviewing court should not disturb the trial court's evidentiary decisions in the absence of an abuse of discretion that creates material prejudice. *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848

N.E.2d 810. Thus, a reviewing court's inquiry is confined to determining whether the trial court acted unreasonably, arbitrarily or unconscionably in deciding the evidentiary issues. *State v. Barnes* (2002), 94 Ohio St.3d 21, 759 N.E.2d 1240.

{¶ 27} The trial court excluded Clark's statement on the grounds that it constituted inadmissible hearsay. Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). CSX argues that Clark's statement that a boom truck would not reach the pole was not hearsay, because it was not offered for the truth of the matter asserted, but was instead offered to rebut Martin's argument that CSX failed to provide him with equipment necessary for him to remove the pole.

{¶ 28} Contrary to CSX's argument, we find that Clark's purported statement that a boom truck could not reach the broken pole was offered at least in part for the truth of the matter asserted. The statement would have served to explain why a boom truck was not used, and the truth of whether a boom truck could, in fact, have reached the pole was not relevant for that purpose. However, CSX's argument would have been bolstered if the jury believed that the boom truck would not have been useful. Thus, the truth of the matter asserted was relevant, and the trial court did not abuse its discretion in excluding the purported statement on hearsay grounds.

{¶ 29} Moreover, even if the statement could have been offered only as proof of something other than the truth of the matter asserted, we find that no prejudice resulted from the statement's exclusion. Clark's deposition was read into the record at trial, and when questioned about the use of a boom truck to remove the pole in question, the following testimony was elicited:

Q. So that I summarize and make sure that I'm correct, I don't want to misstate anything, Mr. Martin and Mr. Stamper go to the scene of this particular incident at mile post CJ 5.5 to remove this pole with a chain saw and the stick. In your estimation, that would be a safety violation; is that correct?

* * *

A. Without being at the location and seeing what they did, you know, I don't—I don't know how to answer that.

Q. If they tried—okay. Well, then, are you able to answer the question, then, that if they had a chain saw and a fiberglass pole to remove this, to remove this pole by cutting it in sections, would you be in a position with that information to say whether or not that was a violation of the rules in the way they went about it?

A. The location of where this happened if I remember it was a—a steep incline. It was—it was hard to do it safely any way. I mean, it's a bad spot. Probably if I had been there and seen them chopping it down with a chain saw, I probably would have stopped them.

Q. You would have stopped them and asked for a boom truck?

A. Yeah. I would have preferred the boom truck to be there. But, you know, depending on the situation to situation, you've just got to look at it. And whether that would have worked, you wouldn't know until you got it there. So—

{¶ 30} Thus, even if Osborne had been allowed to testify that Clark said he did not believe a boom truck would work, this statement was contradicted by Clark's actual testimony, in which he indicated he did not know whether a boom truck would have been effective in removing the pole. In addition, because of Clark's testimony, CSX was able to argue that there was at least some question about whether a boom truck could have been used.

{¶ 31} Thus, CSX's third assignment of error is overruled.

{¶ 32} In its fourth assignment of error, CSX argues that the trial court erred when it excluded evidence regarding Martin's applications for disability benefits. CSX sought to introduce a form that Martin provided to State Farm, in which Martin responded in the negative to a question regarding whether he was seeking disability benefits as the result of a work-related injury. CSX also sought to introduce answers that Martin provided in an interview as part of the process of seeking disability benefits from the Railroad Retirement, in which he stated that he had passed out and hit his head on a flower pot, resulting in his recurrent headaches.

{¶ 33} CSX filed bench briefs on the issue, and the trial court considered argument by the parties prior to the start of trial. At that point, the trial court's decision to exclude the documents was a preliminary ruling, but the trial court affirmed its preliminary ruling over CSX's objection during the trial.

{¶ 34} The collateral-source rule has been defined as " 'the judicial refusal to credit to the benefit of the wrongdoer money or services received in reparation of the injury caused which emanates from sources other than the wrongdoer.' " *Hutchings v. Childress,* 119 Ohio St.3d 486, 2008-Ohio-4568, 895 N.E.2d 520, ¶ 30, quoting *Pryor v. Webber* (1970), 23 Ohio St.2d 104, 107, 52 O.O.2d 395, 263 N.E.2d 235. The United States Supreme Court has held that in FELA cases, introduction of a plaintiff's receipt of disability benefits is improper. *Eichel v. New York Cent. RR. Co.* (1963), 375 U.S. 253, 84 S.Ct. 316, 11 L.Ed.2d 307.

{¶ 35} CSX first argues that Martin's statements were not offered as evidence of the receipt of collateral benefits, but rather were offered to impeach Martin's

credibility as to his claims that his injuries were caused by the October 15, 2002 incident. CSX further argues that Martin opened the door to introduction of evidence regarding his application of disability benefits by offering evidence that he was experiencing financial hardship, the rebuttal of which is a recognized exception to the collateral-source rule. See *Sullivan v. Chesapeake & Ohio Ry. Co.* (C.A.6, 1991), 947 F.2d 946. CSX pointed to testimony from Dr. Carver, Martin's treating psychologist, to references that Martin had made to financial issues during the course of his treatment.

{¶ 36} In deciding to exclude the two pieces of evidence, the trial court cited *Eichel*'s concern with "the danger of the jury finding no liability [or] reducing a damage award when it learns that the plaintiff's loss is entirely or partially covered." The trial court further stated, with regard to the exceptions for rebuttal of a plaintiff's claims of financial hardship:

What I think is the spirit of the exceptions specifically that date do not allow a plaintiff to basically attach and wrap themselves, cloak themselves within the collateral benefit rule but then put on independent evidence that deals with issues that could be rebutted or impeached by a showing of collateral [benefits]. In other words, that type of protection in certain instances when it's used as a sword, although, they don't use the word sword, they use the word springboard, which the plaintiff can go forward with affirmative evidence, and then a boundary of silence exists where the defendant is deprived of the ability to respond to that type of evidence.

The examples that we see in the case law deal with issues such as malingering. They deal with issues of the fiscal status of the plaintiff or aversions by a plaintiff that they're destitute when, in fact, benefits are being received. So they do allow from an exception and they do allow for impeachment with evidence of collateral benefits.

But, again, I think we don't want the exceptions necessarily to swallow the rule. And I think they're carefully defined as instances where the plaintiff has disadvantaged or deprived the defendant of the ability to respond to direct evidence that they have submitted. In this instance, we deal with an element of causation, which is fundamental in these types of cases. So, certainly, it's an important area. And the defendant is essentially stating that because there is that aspect of plaintiff's case in chief they should be allowed to respond with that type of evidence. But the way that I see it there's going to be a causation issue in most any of these cases. I don't think that is something that qualifies under these carefully defined exceptions. I do think that the case authority states that I'm to engage and it's appropriate for me to engage in Rules of Evidence 403(B) type of balancing. And that traditionally allows me to decide the probative value of that type of evidence as to be weighed with the potential

for prejudice or confusion or some type of difficulty in understanding how these issues go together.

And I think, you know, despite the fact that we're just dealing with an application, which, again, several of the cases, including the first case that I discussed, do distinguish that as separate. I think we still have to engage in that balancing. * * * The risk of prejudice is small because the jury is only receiving a very limited amount of information, and then a cautionary or curative instruction can be allowed. But I agree with Mr. Hollon that it would be inappropriate simply to allow those documents on their face, the single document, the State Farm application, I should say, and then the interview. I don't know if that's contained in a questionnaire or if that's a transcript that's not specified but without any further information so as not to confuse the jury.

But I fail to see an application for benefits as being significantly different than receipt of benefits because it essentially raises that issue to the jury. And they're not going to know one way or the other and they may be left to assume certain things. And I think equally significant to the fact that it's simply an application, the fact that Mr. Hollon would be—have to be allowed an opportunity to explain the context—and that's when we get into the litigation and the carpal tunnel and various other materials, some of which may even, you know, be germane in the packet of material that I've received.

But when I consider all of that with the case authority engaged in this balancing, I think that we invariably are going to get into information that isn't relevant to this action first of all and granting an equal opportunity for the plaintiff to respond to that type of impeachment to explain the context. And also I think we are going to be going down a path inevitably where confusion is likely to arise and we're going to have numerous instances where we will be violating * * * the collateral source rule. And I just don't think that the underlying purpose is propelling enough as far as probative value to overweigh that.

{¶ 37} Thus, the trial court's decision, while based in part on the application of the collateral-source rule, in actuality involved a determination by the trial court that the evidence's probative effect was outweighed by its prejudicial effect and should therefore be excluded pursuant to Evid.R. 403(B). Given the trial court's careful weighing of the issues regarding admission of the proposed evidence regarding Martin's receipt of disability benefits, we cannot say that the trial court abused its discretion in excluding that evidence.

{¶ 38} Consequently, CSX's fourth assignment of error is overruled.

{¶ 39} In its fifth assignment of error, CSX argues that the trial court erred when it instructed the jury that it could find CSX liable under the

FELA if it determined that CSX's negligence played any part, no matter how slight, in causing an injury to Martin. Generally, a court should give a requested jury instruction if it is a correct statement of the law, and reasonable minds might reach the conclusion sought by the instruction. *Maghie & Savage, Inc. v. P.J. Dick Inc.*, 10th Dist. No. 08AP–487, 2009-Ohio-2164, 2009 WL 1263965. CSX argues that the instruction given by the trial court had the effect of removing Martin's burden of proving the element of proximate cause necessary to prove a claim of negligence and was therefore an incorrect statement of law.

{¶ 40} Ohio courts have recognized that in FELA cases, "the traditional concept of proximate cause is supplanted by the less stringent standard that there be some causal relation, no matter how slight, between the injury and the railroad's breach of duty." *Smalley v. Norfolk & W. Ry. Co.* (Sept. 2, 1999), 10th Dist. No. 99AP–147, 1999 WL 680151. See also *Hager v. Norfolk & W. Ry. Co.*, 8th Dist. No. 87553, 2006-Ohio-6580, 2006 WL 3634373, ¶ 36.

{¶ 41} The idea that the proximate-cause standard has been supplanted by a less stringent standard stems from the decision by the United States Supreme Court in *Rogers v. Missouri Pacific RR. Co.* (1957), 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493. CSX now argues that Supreme Court cases since Rogers have recognized that proximate cause continues to be an element required to establish a railroad's liability under FELA. See, e.g., *Norfolk S. Ry. Co. v. Sorrell* (2007), 549 U.S. 158, 127 S.Ct. 799, 166 L.Ed.2d 638. However, in *Sorrell*, the Supreme Court, while acknowledging the argument presented by CSX, i.e., that FELA cases require the same standard of proximate cause as other negligence cases, expressly declined to address that argument. *Sorrell*, 549 U.S. at 164, 127 S.Ct. 799, 166 L.Ed.2d 638.

{¶ 42} We recognize that there may be some question regarding the validity of the principle that proximate cause in FELA cases has been supplemented by a less stringent "some causal relation, no matter how slight" standard. However, unless the United States Supreme Court expressly concludes that those cases that have applied that standard are incorrect, we are constrained to follow those Ohio cases, such as *Smalley* and *Hager*, that have continued to recognize the principle. Thus, we cannot say the trial court's instruction included an incorrect statement of law.

{¶ 43} Therefore, CSX's fifth assignment of error is overruled.

{¶ 44} In its sixth assignment of error, CSX asserted that the trial court erred when it overruled CSX's motion for summary judgment. However, in briefing, CSX sets forth no separate argument on that issue. Thus, we need not address it. App.R. 12(A)(2).

{¶ 45} Martin's two assignments of error in his cross-appeal are interrelated, and will therefore be addressed together. Martin argues that the trial court erred when it failed to direct a verdict in his favor on the issue of contributory negligence, and then failed to grant a judgment notwithstanding the verdict when the jury found that he was 30 percent contributorily negligent. Essentially, Martin argues that the evidence was insufficient to support the jury's finding that he was contributorily negligent.

{¶ 46} At trial, Martin described the assignment given to him by Chris Clark as "if we got a chance to go down and look at that pole and then to take it out if we had to." On cross-examination, CSX elicited the following testimony from Martin:

Q. Now, we've already talked about Chris Clark, your supervisor. And I want to talk about when he gave you the assignment. There were no trains stopped that day, were there?

A. No.

Q. In fact, I think you've said earlier today that when Mr. Clark told you that if you had the chance check out that pole and if it were necessary to remove it. Isn't that what you told us?

A. Yes.

Q. You were given that assignment, but you didn't ask for any instructions?

A. Instructions to what?

Q. How to do it.

A. We had to do it every day, cut trees out. It's no different.

Q. So you believed you knew how to do it because you cut trees out all the time, right?

A. Yes, I did.

Q. Now, prior to that date, you had never asked a superior to provide you with assistance and have them refuse you, had you?

A. No.

Q. And if you felt you needed assistance on October 15th to remove that pole, you could have called Chris Clark and asked for it, right?

A. Well, to start with, usually we only have two people. And me and [Tim Stamper] could have handled the pole and taken it out. But in a freak accident, this pole flipped back and hit me. That's no different than when we've cut trees out of the lines before.

Q. Okay. If you felt you needed more people to help you, you could have called Chris and asked for it, couldn't you?

A. I could have. Yes.

Q. In fact, if you felt you needed a boom truck, you could have called Chris; isn't that right?

A. Yes.

Q. Well, if you felt you needed a boom truck on October 15, 2002, and that you would not have been able to do it without a boom truck, you could have called Chris; isn't that right?

A. If I felt like I couldn't have done that job on October 15, 2002, I would not have attempted it.

Q. I understand that. And my question is: If you thought you would have needed a boom truck to help you get that job done, you could have called and asked for it?

A. If I thought I would have needed a boom truck, yes.

* * *

Q. You didn't call for a boom truck?

A. No.

Q. You didn't call for extra assistance or equipment?

A. Didn't feel like I needed to.

Q. Right. And if you felt you couldn't do the job, you could have just chosen not to do it; isn't that right?

A. If I felt I couldn't have done the job, I wouldn't have started it.

{¶ 47} Given this evidence, a jury could have reasonably believed that Martin was negligent in failing to recognize the risk posed by a pole with wires attached to it versus that posed by a tree. The jury could further have reasonably concluded that Martin was negligent for failing to recognize that additional help and equipment may have been needed to remove the pole safely. Thus, we cannot say that the trial court erred when it declined to direct a verdict, or to grant a motion for judgment notwithstanding the verdict, on the issue of Martin's contributory negligence.

{¶ 48} Thus, Martin's two assignments of error on cross-appeal are overruled.

{¶ 49} Accordingly, we sustain CSX's second assignment of error on the issue of future wage loss, overrule the remainder of CSX's assignments of error and Martin's assignments of error on cross-appeal, and remand this matter to the Franklin County Court of Common Pleas for entry of judgment consistent with this decision.

Judgment affirmed in part
and reversed in part,
and cause remanded.

FRENCH, P.J., concurs.

BROWN, J., concurs in part and dissents in part.

BROWN, Judge, concurring in part and dissenting in part.

{¶ 50} Disagreeing with the conclusion reached by the majority with regard to CSX's second assignment of error, I respectfully dissent. After reviewing the evidence presented, I would find the trial court did not abuse its discretion when it submitted the issue of future damages to the jury, as there was evidence presented that appellant's injuries were permanent in nature and that such injuries prevented him from attaining his preinjury wage. For this reason, I would overrule CSX's second assignment of error. I concur, however, with the majority's disposition of the remaining assignments of error.